UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS POWER,<br>        *Plaintiff*, | Civil Division |
| v. | Docket No. 2:17-CV-00154-MRH |
| HEWLETT-PACKARD COMPANY,<br>        *Defendant*. | Hon. Mark R. Hornak<br><br>Friday, May 13, 22 |

## HP, INC.'S MOTION TO PRECLUDE PLAINTIFF'S MEDICAL EXPERT, MICHAEL DREW, MD, FACS, FROM OFFERING AN OPINION REGARDING PLAINTIFF'S ALLEGED INCONTINENCE

Defendant, HP, Inc. (improperly named Hewlett-Packard Company in the plaintiff's complaint) moves to preclude plaintiff's medical expert, Michael Drew, from offering an opinion regarding the plaintiff's alleged incontinence. As discussed in the accompanying memorandum of law, Dr. Drew's opinion that the plaintiff's incontinence results from a burn injury is based on speculation and conjecture. His opinion is not based on reliable principles, methods, or sufficient facts and data. Instead, Dr. Drew simply speculates that because plaintiff began suffering from incontinence after the date of the burn injury, that there must be a causal connection. However, Dr. Drew never examined the plaintiff or conducted any tests, and as Dr. Drew has acknowledged, plaintiff's own treating physicians found no causal connection. Nor did Dr. Drew consult any medical texts, treatises, articles. Moreover, Dr. Drew has not identified any specific physical or psychological condition that allegedly caused plaintiff's condition. Thus, Dr. Drew's proposed testimony fails to meet the requirements of Fed. R. Evid. 702 and must be excluded in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). HP requests a *Daubert* hearing.

Wherefore, for the reasons set forth above and in its accompanying memorandum of law, HP, Inc., respectfully requests that the Court conduct a *Daubert* hearing and preclude Dr. Michael Drew from offering any opinion testimony regarding plaintiff's incontinence claim, in accordance with the Court's gatekeeping function to assure that expert testimony is reliable and in keeping with the requirements of Rule 702 and *Daubert.*

        Respectfully submitted,

        */s/ Michael A. Weiner*
        _____

        Michael A. Weiner, Esquire
        PA I.D. #93640
        Bennett, Bricklin & Saltzburg LLC
        707 Grant Street, Suite 1800
        Pittsburgh, PA 15219
        Phone: (412) 894-4101
        Fax: (412) 894-4111
        weiner@bbs-law.com

        Christopher G. Betke
        *Pro Hac Vice*
        Coughlin Betke LLP
        175 Federal Street
        Boston, MA 02110
        (617) 988-8050
        (617) 988-8005
        cbetke@coughlinbetke.com

        Attorneys for HP, Inc.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS POWER,<br>             *Plaintiff*, | Civil Division |
| v. | Docket No. 2:17-CV-00154-MRH |
| HEWLETT-PACKARD COMPANY,<br>             *Defendant*. | Hon. Mark R. Hornak<br><br>Friday, May 13, 22 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE PLAINTIFF′S MEDICAL EXPERT, MICHAEL DREW, MD, FACS, FROM OFFERING AN OPINION REGARDING PLAINTIFF'S ALLEGED INCONTINENCE**

Plaintiff, Thomas Power, contends that on June 20, 2015, he was using an HP Elitebook 8730w notebook computer (the ″Elitebook") when it exploded, causing him to sustain burn injuries to his thighs (the ″accident"). Plaintiff now contends that he suffers from incontinence as well. None of his treating physicians, including his treating urologist, causally connect plaintiff′s incontinence to the accident. Therefore, in an attempt to establish such a connection, plaintiff retained an expert, Dr. Michael Drew. Essentially, Dr. Drew′s opinion is that because plaintiff′s incontinence started after the accident, it must have been caused by the accident. This opinion is not based on reliable methodology as required under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and must be precluded from trial. HP requests a *Daubert* hearing.

**FACTUAL BACKGROUND**

I.    **The Subject Accident**

On June 20, 2015, plaintiff was using his Elitebook, which he had purchased used on eBay. The Elitebook contained aftermarket batteries that were not made by HP and were not approved

for use in HP products. On the date in question, the batteries in the Elitebook allegedly caught fire, causing plaintiff to sustain burn injuries to his thighs.

## II.     Plaintiff's Retention of Dr. Michael Drew

At some point after the accident, plaintiff began complaining of incontinence. He saw a urologist, Dr. Paul Ogagan, who examined the plaintiff. After examining the plaintiff, Dr. Ogagan determined that there was *no evidence* of a genitourinary injury and did not find any relationship between the accident and plaintiff's incontinence. Nevertheless, plaintiff contends in this litigation that there is a connection, so in support of that claim he has retained Dr. Michael Drew, a general surgeon who has never practiced urology. *Transcript of Dr. Drew's Deposition (Exhibit B)* at 12:22-24 *which is currently pending court approval for seal pursuant to HP's Application for Leave to File Under Seal.*

## III.    Dr. Drew's Opinion and Methodology

In his report, Dr. Drew states that at some unspecified time after the June 20, 2015, accident plaintiff began complaining of incontinence. *Dr. Drew's Report (Exhibit A)* at p. 2 *which is currently pending court approval for seal pursuant to HP's Application for Leave to File Under Seal.* Dr. Drew never reviewed pre-accident records from plaintiff's primary care physician. *Exhibit B* at 27:5-9 *which is currently pending court approval for seal pursuant to HP's Application for Leave to File Under Seal..* Other than reviewing plaintiff's deposition testimony from 2018, Dr. Drew took no steps to ascertain whether plaintiff experienced incontinence prior to the accident. *Id.* at 27:13-18; 34:7-9. He never spoke with the plaintiff. *Id.* at 27:10-12.  He did not examine the plaintiff and did not perform any tests. *Id.* at 32:6-12. He never examined the scarring on plaintiff's legs and has never seen any photographs of the scars. *Id.* at 41:4-14. He did not consult any medical texts, treatises, or articles relating to incontinence or urology. *Id.* at 32:12-

2

16. Dr. Drew is not a psychologist or psychiatrist. He did not conduct any psychological tests. *Id.* at 33:5-11. He acknowledges that plaintiff had psychological conditions, including post-traumatic stress disorder, depression, and other psychological conditions that predated the accident. *Id.* at 33:12-20. Dr. Drew also admitted that plaintiff's treating physicians, including his urologist, did not find any relationship between the accident and the incontinence. *See id.* at 31:17-25; 38:13-23. Nevertheless, Dr. Drew then concluded in his report, without any explanation or elaboration, "The incontinence… is clearly related to the injuries whether physical, psychological or a combination of the two." *Exhibit A* at p. 3 *which is currently pending court approval for seal pursuant to HP's Application for Leave to File Under Seal.*

### IV.     Dr. Drew Cannot Articulate a Physical Cause of Plaintiff's Incontinence

Dr. Drew equivocated on the issue of whether plaintiff's physical injury could have caused his incontinence, but ultimately acknowledged that he could not articulate a causal connection. As he stated at one point in his deposition, "I can't cite you a, and I don't think there exists, a mechanism of injury where a nerve in the thigh caused the incontinence, **that doesn't exist**, so I think it's probably just – it's related to psychological, and it may be from the, you know, from the sensory issues related to the perineum and the pelvis, but that's where I come up with that. It's a purely temporal situation. This was never in existence before, and it was always part of his complaints after." *Exhibit B* at 26:19-27:4 *which is currently pending court approval for seal pursuant to HP's Application for Leave to File Under Seal.* (emphasis added). At another point, Dr. Drew speculated that perhaps there "could be some sensory issues related to" the scarring on plaintiff's thighs that could have caused the incontinence. *Id.* at *27:19-28:*8. Ultimately, however,

3

Dr. Drew admitted, "I don't think there's a specific mechanism of injury here, physical, that would explain purely the incontinence." *Id.* at 28:10-12.

### V. Dr. Drew Cannot Articulate a Psychological Cause of Plaintiff's Incontinence

Dr. Drew also equivocated on a possible psychological cause for plaintiff's incontinence. Dr. Drew admitted that plaintiff had a long history of PTSD, depression, and other psychological conditions that predated the accident. *Id.* at 33:12-20. Yet, he disregarded these records in arriving at his opinion that plaintiff's incontinence was the result of some unspecified psychological reaction to the accident. *Id.* at 33:21-24. At one point in his deposition, Dr. Drew opined that the cause plaintiff's incontinence was probably psychological, as opposed to physical, in nature, stating, "I **would probably say** more – more psychological than physical." *Id.* at 36:19-13 (emphasis added). To support this opinion, however, he could only point to the temporal connection, and stated, "the fact that… [plaintiff] was, as most of us would be, sort of freaked out, if you will, by seeing an explosion…that's where my opinion comes from." *Id.* at 36:18-23. Again, Dr. Drew has never spoken to the plaintiff. In any case, even after seeming to settle on a psychological cause, Dr. Drew still would not commit to that position, stating later on in his deposition that "there are objective findings in terms of the bladder" to suggest a possible physical cause. *Id.* at 50:1-11.

### VI. Ultimately, Dr. Drew's Opinion Is Based on the Assumption that Because Plaintiff's Complaints of Incontinence Started after the Accident, the Accident Must Have Caused the Incontinence

Ultimately, Dr. Drew is unable to specify the cause of plaintiff's incontinence and relies on equivocation and vagueness. As he stated in his report, "The incontinence that remains is clearly related to the injuries whether physical, psychological or a combination of the two." *Exhibit A* at

4

p. 3 *which is currently pending court approval for seal pursuant to HP's Application for Leave to File Under Seal.*. At no point in his report or at his deposition did Dr. Drew identify any specific physical or psychological condition that plaintiff has that could cause incontinence. And at his deposition, he admitted that he is unable to render an opinion within a reasonable degree of scientific or medical certainty whether plaintiff's incontinence is psychological versus physical, or some combination thereof. *Id.* at 37:16-22. As he testified near the conclusion of his deposition:

> Q: Your opinion that you just gave with regard to causation or contribution to the incontinence, is it your understanding that both physical and psychological components to that causation exist, you just can't say how much of one or the other is involved?
>
> A: That -- yes, I think that's a fair paraphrasing of my opinion, yes.

*Id.* at 49:14-25. *See also id.* at 34:14-15 (it "would be very difficult to distinguish" whether the cause was psychological or physical).

Unable to decide how exactly plaintiff's incontinence came to be, Dr. Drew's opinion can be summed up in the following testimony: "Well, it's based on the temporal relationship, I mean, I think I read his deposition, I saw the medical records, incontinence was never present before this event." *Id.* at 26:8-11. But, as noted above, Dr. Drew conducted no research or testing, did not examine the plaintiff, did not talk to the plaintiff, and did not consult any medical texts, treatises, or articles. Thus, his opinion, which directly contradicts the opinions of plaintiff's treating physicians, including an actual urologist, is based on speculation and assumptions alone and not any scientific methodology and must be precluded from trial.

## ARGUMENT

I.  **Standard for Admissibility of Expert Testimony**

5

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit":

> Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert.
>
> Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds for his on her belief. In sum, Daubert holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.
>
> Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003), *citing In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 749 (3d Cir. 1994), *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

"Evaluating the reliability of an expert's methodology is not a credibility determination but a critical gatekeeping function for judges — not juries — to perform." *Wood v. Showers*, 822 F. App'x 122, 125 (3d Cir. 2020), *citing Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999) (Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any

6

and all scientific testimony . . . is not only relevant, but reliable" (*quoting Daubert*, 509 U.S. at 589)); *see also Daubert*, *supra*. at 592-93 (explaining that a trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue").

In offering an opinion on medical causation, a medical expert "may rely on various types of relevant medical information such as a physical examination, medical records, tests, medical literature, and experience. The expert need not make use of all of these techniques to render a reliable diagnosis." *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.,* No. 2848, 2021 U.S. Dist. LEXIS 230252, at *9 (E.D. Pa. Dec. 1, 2021) (citations omitted). "A medical expert, however, must do more than simply pronounce an opinion [on causation of] a plaintiff's injuries. As the Supreme Court has declared on several occasions, the *ipse dixit* of the expert as the only connection to the underlying data is insufficient to establish reliability." *Id., citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). *See also GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

In the *Zostavax* litigation, for example, the plaintiffs alleged that they developed shingles after being inoculated with the Zostavax vaccine. *In re Zostavax, supra,* at *5. The named plaintiffs in the case developed shingles between seven days and one year of receiving the vaccine. *Id.* at *25. In support of their claim, they retained Dr. Mark Poznansky to opine on the causal connection. *Id.* at *5. The defendant moved to exclude his testimony in accordance with Rule 702 and *Daubert. Id.* at *3. The court granted the motion on the grounds that Dr. Poznansky relied on the temporal relationship between the date of the vaccines and the onset of shingles without conducting a

differential diagnosis. *Id.* at *14. Noting that a temporal relationship was not enough to establish causation, the Court held, "The court cannot admit expert testimony based solely on the *post hoc ergo propter hoc* fallacy, that is, the fallacy that the mere happening of an event such as a vaccination injection must be the cause of a later happening such as an illness or injury." *Id.* at *20. It concluded:

> Plaintiffs' expert Dr. Poznansky simply opines that it was the vaccine that caused their injuries without any reliable methodology. He fallaciously and indiscriminately relies on a temporal link…he has not made the required differential diagnosis. The jury would be left with nothing but speculation as to what caused plaintiffs' shingles…The law however does not countenance speculation. It requires sufficient evidence to enable plaintiffs to sustain their burden of proof. From the parts of the record to which plaintiffs refer in their briefs, such evidence complying with *Daubert* is lacking.

*Id.* at *25.

## II. Dr. Drew's Testimony Must Be Excluded Because He Relies Solely on the Temporal Relationship Between the Accident and the Onset of Incontinence

Dr. Drew's opinion must be excluded for the same reason Dr. Poznansky's opinion was excluded in the *Zostavax* litigation. Like Dr. Poznansky, Dr. Drew simply assumes that because the onset of incontinence happened after the accident, there must be a causal connection. However, Dr. Drew did not conduct any tests or research into possible causes. Like Dr. Poznansky's opinion, Dr. Drew's position suffers from the *post ergo propter hoc* fallacy. Even worse, as discussed above, Dr. Drew has not been able to articulate what exactly that causal connection is, generally or specifically. At most, he contends, in a noncommittal manner, that it is some combination of psychological and physical causes, but he does not identify what the specific causes are, and as evidenced by his deposition testimony, he cannot even decide whether the physical or psychological cause predominates.

## III. Dr. Drew's Testimony Must Be Excluded Because It Is Not Based on Reliable Methodology

8

Further, Dr. Drew's testimony should be excluded because there is no methodology underlying it. Although *Daubert* and Rule 702 permit a medical expert to "rely on various types of relevant medical information such as a physical examination, medical records, tests, medical literature, and experience," *In re Zostavax, supra,* at *9, the only medical evidence Dr. Drew relied on – the plaintiff's medical records – indicated that a causal connection *was not established.* Dr. Drew did not examine or interview the plaintiff, he did not conduct any research or testing, he did not view photos of plaintiff's injuries, and he did not consult medical treatises or articles. Yet, Dr. Drew disregards the only medical evidence that he did review and asserts without explanation his subjective opinion that there is a causal connection simply because there must be based on the timing of symptoms. This is classic *ipse dixit* testimony that must be excluded and which will do nothing to assist the trier of fact.

## CONCLUSION

For the reasons set forth above, the defendant, HP, Inc., requests that the Court conduct a *Daubert* hearing and preclude Dr. Michael Drew from offering any opinion testimony regarding plaintiff's incontinence claim, in accordance with the Court's gatekeeping function to assure that expert testimony is reliable and in keeping with the requirements of Rule 702 and *Daubert.*

Respectfully submitted,

*/s/ Michael A. Weiner, Esquire*

Michael A. Weiner, Esquire
PA I.D. #93640
Bennett, Bricklin & Saltzburg LLC
707 Grant Street, Suite 1800
Pittsburgh, PA 15219
Phone: (412) 894-4101
Fax: (412) 894-4111
weiner@bbs-law.com

Christopher G. Betke
*Pro Hac Vice*
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
(617) 988-8005
cbetke@coughlinbetke.com

Attorneys for HP, Inc.

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS POWER,<br>   *Plaintiff*, | Civil Division |
| v. | Docket No. 2:17-CV-00154-MRH |
| HEWLETT-PACKARD COMPANY,<br>   *Defendant*. | Hon. Mark R. Hornak |

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2022, a true and accurate copy of the foregoing Motion and Memorandum of Law in Support of Motion were served via the Court's Electronic Case Filing System to all counsel of record.

            */s/ Michael A. Weiner, Esquire*
            _____

            Michael A. Weiner, Esquire
            PA I.D. #93640
            Bennett, Bricklin & Saltzburg LLC
            707 Grant Street, Suite 1800
            Pittsburgh, PA 15219
            Phone: (412) 894-4101
            Fax: (412) 894-4111
            weiner@bbs-law.com

            Christopher G. Betke
            *Pro Hac Vice*
            Coughlin Betke LLP
            175 Federal Street
            Boston, MA 02110
            (617) 988-8050
            (617) 988-8005
            cbetke@coughlinbetke.com

            Attorneys for HP, Inc.