**EXHIBIT A**

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF PENNSYLVANIA
 2
                         - - - -
 3
      THOMAS POWER,               )
 4                                )
              Plaintiff,          )
 5                                ) No.
           -vs-                   ) 2:17-cv-00154-MRH
 6                                )
      HEWLETT-PACKARD COMPANY,    )
 7                                )
              Defendant.          )
 8
 9
10                       - - - -
11          VIDEO ZOOM DEPOSITION OF:
12              WILLIAM KITZES, J.D.
13                       - - - -
14
15
                    DATE:  March 14, 2022
16                         Monday, 10:04 a.m.
17
18          REPORTED BY:   Kristin Lytle, RPR
                           Notary Public
19                         Job No. KL82483
20
21
22           NETWORK DEPOSITION SERVICES
            707 GRANT STREET, SUITE 1101
23              PITTSBURGH, PA 15219
24
25
```

**NETWORK DEPOSITION SERVICES**
Transcript of William Kitzes, J.D.

2 (Pages 2 to 5)

Page 2

1    VIDEO DEPOSITION OF WILLIAM KITZES, J.D.,
     a witness, called by the
2    Defendant for examination, in accordance with
     the Federal Rules of Civil Procedure, taken
3    by and before Kristin Lytle, RPR, a Court
     Reporter and Notary Public in and for the
4    Commonwealth of Pennsylvania, on Monday,
     March 14, 2022, commencing at 10:04 a.m.
5
6    REMOTE APPEARANCES:
7        FOR THE PLAINTIFF:
         FRIDAY & COX
8        Peter J. Friday, Esq.
         pfriday@fridaylaw.com
9        1405 McFarland Road
         Pittsburgh, PA  15216
10
11       FOR THE DEFENDANT:
         COUGHLIN & BETKE
12       Christopher Betke, Esq.
         cbetke@coughlinbetke.com
13       175 Federal Street, Suite 1450
         Boston, MA  02110
14
15       ALSO PRESENT:
         Raymond Urbash, videographer
16
17
18
19
20
21
22
23
24
25

Page 3

1            * I N D E X *
2    Examination by Mr. Betke   - - - - - -  5
     Examination by Mr. Friday  - - - - - - 125
3
4    Certificate of Court Reporter - - - - - 127
     Errata Sheet  - - - - - - - - - - - -  128
5    Notice of Non-Waiver of Signature - - - 129
6
          * INDEX OF EXHIBITS *
7
     Exhibit 1 - Mr. Kitzes's report - - - -  10
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            THE VIDEOGRAPHER:  We are now
2    on the record.  Good morning.  The date
3    today is March 14, 2022, and the time
4    is 10:04 a.m.  This is the videotape
5    deposition of Mr. William F. Kitzes,
6    J.D., taken in the matter of Thomas
7    Power versus Hewlett-Packard Company
8    filed in the U.S. District Court for
9    the Western District of Pennsylvania,
10   Case Number 2:17-CV-00154-MRH.
11           My name is Raymond Urbash,
12   and I'll be the videographer.  Our
13   court reporter is Kristin Lytle, and we
14   represent Network Deposition Services.
15           At this time if counsel
16   present can state their name and
17   appearances for the record after which
18   our court reporter may swear in the
19   witness and we can proceed.
20           MR. BETKE:  Chris Betke for
21   HP.
22           MR. FRIDAY:  Peter Friday for
23   the plaintiff.
24              - - - -
25       WILLIAM KITZES, J.D.,

Page 5

1    having been duly sworn,
2    was examined and testified as follows:
3              - - - -
4            EXAMINATION
5              - - - -
6    BY MR. BETKE:
7    Q.   All right.  Thank you.
8            Good morning, Mr. Kitzes.  My
9    name is Chris Betke, and I represent HP
10   in this matter as you probably have
11   figured out for yourself after hearing
12   us talk a little bit.  The -- a couple
13   of things.  We agreed off the record,
14   plaintiff counsel and I, to reserve
15   objections except as to form and
16   motions to strike until the time of
17   trial.
18           I'm just going to go over a
19   few ground rules.  I know you have
20   testified previously because I have
21   your list of testimony.  But just to
22   make sure we're operating on the same
23   page here this morning.
24   A.   Sure.
25   Q.   A little bit -- a little bit different

Page 14

1   Q.  Okay.
2   A.  So if I bill 5-and-a-half, it's 5 --
3       five 8-hour days and another 4 hours.
4   Q.  Okay.  All right.  And so if you worked
5       about 5 or 6 days, that means you
6       worked somewhere between about 40 to --
7       40 -- what is it -- 46 hours?
8   A.  Yeah.  About that, yeah.  Five days
9       took me 40 hours.
10  Q.  All right.  Did you need to buy
11      anything in connection with your work
12      on this case?  In other words, did you
13      incur any expenses to speak of?
14  A.  No, sir.
15  Q.  And can you tell me when you began your
16      work on this matter?
17  A.  I can't precisely but I would think it
18      would have been the summer of 2020.
19  Q.  Okay.
20  A.  About 3 or 4 months before the report
21      is dated.
22  Q.  Perfect.
23          Have you worked with the law
24      firm of Friday & Cox previously?
25  A.  Yes.

Page 15

1   Q.  About how many times?
2   A.  Well, prior to writing this report I
3       would say once.
4   Q.  All right.
5   A.  Maybe twice.
6   Q.  All right.  And how about since you
7       wrote this report?
8   A.  I have currently another 2 or 3 cases
9       with them.
10  Q.  Now I notice you have a J.D.  Did you
11      ever practice law?
12  A.  I never -- never took a client as an
13      attorney.  I never practiced law.  I
14      hold an inactive license in the
15      District of Columbia.
16  Q.  Okay.
17  A.  I held a license in Missouri 30 or
18      40 years ago, but I let it lapse when I
19      was no longer affiliated with the young
20      woman who I married in Missouri.
21  Q.  Okay.  That's a can of worms that I'm
22      not going to open.
23  A.  No kids.
24  Q.  All right.  Let's see here.  Now you
25      worked at the Consumer Product Safety

Page 16

1       Commission until 1981; am I correct
2       about that?
3   A.  May 1, 1981.
4   Q.  All right.  And have you worked for any
5       other governmental agency from that
6       date until now?
7   A.  Well, for 14 years I was the chairman
8       of the Florida Consumer Council.  But I
9       didn't get -- that was a voluntary job.
10      I just got expenses.
11  Q.  Okay.  When you were at the Consumer
12      Product Safety Commission, did you ever
13      have occasion to deal with notebook
14      computers or lithium ion batteries?
15  A.  I don't think either of them were in
16      existence when I worked at the
17      commission, so no.
18  Q.  I believe that is correct.  I think
19      that is correct, but you know, I wanted
20      to ask.
21  A.  Well, I take it back.  There were
22      notebooks.  But the compact, the old
23      big compact with the little tiny screen
24      that was available then.
25  Q.  Yeah.  I mean, I think -- I think

Page 17

1       computers existed but not notebook
2       computers, correct.
3   A.  I believe that's correct.
4   Q.  And that same is true with lithium ion
5       batteries, correct?
6   A.  To the best of my recollection,
7       absolutely correct.
8   Q.  All right.  And is it fair to say, sir,
9       that you never had any professional
10      affiliation or work in either computer
11      notebook design or manufacture?
12  A.  That would be correct.
13  Q.  And also same question with respect to
14      battery packs.  Did you ever have any
15      affiliation professionally with battery
16      pack design or manufacture?
17  A.  Well, I've had a previous case
18      involving an explosion of a Dell, but I
19      don't know what you mean by associated.
20      If that qualifies, then I did.
21  Q.  You know what -- yeah, okay.  So I'm
22      really talking about -- when I talk
23      about design and manufacture, I mean on
24      the business side.  In other words, not
25      on a forensic side or lawsuit side.

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

6 (Pages 18 to 21)

Page 18

1    Did you ever work for a
2  company where you played a role in
3  either battery pack design or
4  manufacture?
5  A.  Absolutely not.
6  Q.  All right.  And again, the same sort of
7  question regarding the business side of
8  things.  Did you -- were you ever
9  engaged by a notebook computer company
10  or a battery pack manufacturer to -- to
11  advise on safety or warning labels or
12  anything like that?
13  A.  No, sir.
14  Q.  Okay.  So now I'm going to shift -- you
15  anticipate where I'm going.  I'm going
16  to shift to the forensic work, if you
17  will, or litigation -- we'll call it
18  litigation-related services.
19       Have you had any cases
20  involving let's start with notebook
21  computers previously?
22  A.  Yes.
23  Q.  Okay.  Can you identify for the record
24  those cases?
25  A.  I recall one case and it was a Dell

Page 19

1  laptop.
2  Q.  And when and where was that case?
3  A.  Oh, it was probably 5 or 7 years ago,
4  and it was right here in Broward
5  County, which is just south of me, Fort
6  Lauderdale.
7  Q.  In the pre-Zoom days that made it quite
8  convenient; did it not?
9  A.  Yes, it did.
10  Q.  Did -- what was the -- what was the
11  general -- the gist of that case?
12  A.  A guy fell asleep with a Dell laptop on
13  his bed.  The house caught fire and he
14  died of smoke inhalation to the best of
15  my recollection.
16  Q.  Was there an allegation in that case
17  that there was a problem or issue with
18  a -- the battery pack in the Dell
19  laptop?
20  A.  That's my recollection, yes, sir.
21  Q.  Okay.  And did you render any opinions
22  regarding the Dell laptop?
23  A.  The laptop and the battery, yes.
24  Q.  Okay.  Just as best you can recall what
25  was the upshot of your opinion?

Page 20

1  A.  Well, I didn't look at the case.  But
2  my opinion was that the battery
3  overheated, started the fire.  There
4  were no warnings concerning leaving it
5  plugged in and its relationship to
6  combustibles.
7  Q.  Okay.  So let me just back up.
8       You didn't offer any opinion
9  about what caused the fire, rather --
10  A.  No, sir.
11  Q.  Is that fair?
12  A.  That's fair.
13  Q.  Rather you --
14  A.  Let me -- I'm sorry.  I'm speaking over
15  you.  Go ahead.
16  Q.  Yeah, I was just going to say rather as
17  I understand it you were presented with
18  a scenario where it was opined by
19  someone that the notebook computer
20  caused the fire because it was plugged
21  in and it was in connection with
22  combustibles.  And based upon that you
23  rendered an opinion about warnings or
24  lack thereof; is that fair?
25  A.  Yes.  But I -- I did educate myself on

Page 21

1  the surface technology of the
2  batteries.  I'm not an engineer.  I
3  didn't render an opinion as to
4  causation if that's the question.
5  Q.  Yeah.  That is the question I guess.
6  Right.
7  A.  I did not.
8  Q.  But you're saying you did sort of a --
9  you got yourself a general
10  understanding at least to your belief
11  about what -- what could have caused
12  the fire and how it could have
13  happened; is that fair?
14  A.  Just on a very general level, yes, sir.
15  Q.  All right.  But certainly you weren't
16  being offered as an expert in that
17  regard nor did you opine as an expert
18  in that regard, correct?
19  A.  That's correct.
20  Q.  All right.  And aside from that one
21  case involving Dell, have there been
22  any other instances where you have
23  offered opinions regarding either
24  notebook computers or lithium ion
25  batteries?

Page 22

1  A.  Not to the best of my recollection.
2  Q.  Okay. Do you recall the name of that
3      case?
4  A.  I can look it up. The attorney's name
5      was Dan Cytryn, C-Y-T-R-I-N, or
6      C-I-T-R-Y-N. I can look up the name
7      for you.
8  Q.  Okay. I would ask if you would do
9      that. Thank you.
10 A.  Uh-huh.
11 Q.  Is it in your list of testimony by any
12     chance?
13         I think it's outside the --
14     it may be outside the prior time but --
15 A.  It's outside 4 years. And it -- and
16     it -- it didn't go to trial.
17 Q.  Okay. Did you give -- did you give a
18     deposition in that case; do you recall?
19 A.  I believe I did.
20 Q.  All right.
21 A.  But I will get the caption to Pete, and
22     he can pass it on to you.
23 Q.  All right. Thank you.
24         So prior to this case you had
25     no -- you've had no professional work

Page 23

1      for -- involving -- meaning, you know,
2      business work regarding notebook
3      computers or battery packs. And your
4      one instance of testifying is the Dell
5      case, correct?
6  A.  Correct.
7  Q.  All right. And you're not an
8      electrical engineer nor do you have any
9      engineering background, correct?
10 A.  I'm not an engineer. I have never -- I
11     don't have a degree in engineering. I
12     have taken some courses that relate to
13     engineering like at the University of
14     Michigan. But I don't claim to be an
15     engineer, I'm not an engineer, and I
16     will not render engineering opinions.
17 Q.  All right. Fair enough.
18         Have you written any
19     peer-reviewed articles about notebook
20     computers or lithium ion batteries?
21 A.  No, sir.
22 Q.  All right. Are you an expert in human
23     factors?
24 A.  As it relates to warnings and safety
25     communication, yes, but not the

Page 24

1      entirety of human factors.
2  Q.  Have you ever been subject to what they
3      call a Daubert challenge?
4  A.  Often.
5  Q.  Have there -- have there been any
6      successful ones?
7  A.  Well, there have been a couple cases
8      where I haven't gotten to testify.
9  Q.  Okay. And so -- go ahead.
10 A.  Go ahead. No, ask your question.
11 Q.  So what cases were those?
12 A.  Well, the ones I can recall there was a
13     case in New Jersey that involved the
14     placement of a warning label on a
15     WaveRunner, a personal watercraft, a
16     Yamaha.
17 Q.  Yeah.
18 A.  And the judge said I was qualified to
19     render opinions but the jury could
20     figure it out themselves.
21 Q.  Okay.
22 A.  There was a case in Pittsburgh on a
23     Scripto Tokai utility lighter where
24     there were 2 or 3 experts testifying on
25     the same product, and the judge said

Page 25

1      that it was cumulative and I didn't
2      testify.
3          There was a case in Ohio
4      called -- the product manufacturer was
5      called Leatt. It was a South African
6      manufacturer of back braces for BMX
7      bicycle racers. And the judge in Ohio
8      said my report wasn't sufficiently in
9      depth. But with the same lawyers, the
10     same product also in federal court in
11     Kentucky the judge said I was more than
12     welcome to testify about the same
13     thing.
14 Q.  All right.
15 A.  And there may have been one or two
16     others, but those are the ones that I
17     recall.
18 Q.  All right. Okay. So can you just tell
19     me, sir, generally what you did in
20     order to render your opinions in this
21     case?
22         Just walk me through what --
23     what actions you took. And you don't
24     have to go in deep detail. We're
25     talking right now general. I'll ask

Page 26

1   more specifically.
2   A.   Sure.
3   Q.   Generally what did you do?
4   A.   I collected all the data in my report.
5        I subjected it to a risk assessment.
6        Design review is the old term.  Risk
7        assessment is the new term.  I looked
8        at the warnings and instructions, took
9        the injury data into account, and wrote
10       my opinions.
11  Q.   Okay.  Did you ever talk to Mr. Power?
12  A.   No.
13  Q.   Why not?
14  A.   I generally don't.  I got the
15       information about the incident, and I
16       rarely talk to the plaintiff unless it
17       goes trial.
18  Q.   Okay.  Well, in this particular
19       instance, you're offering an opinion
20       that he wasn't warned about something,
21       right?
22  A.   Right.
23  Q.   And so how did you determine that he
24       even needed a warning?
25  A.   Well, it's clear from the facts that he

Page 27

1        was surprised when it exploded.  And my
2        testimony concerns what HP needed to do
3        in order to adequately warn people.
4   Q.   All right.  So is it fair to say that
5        you did not really make any assessment
6        about whether or not Mr. Power needed a
7        warning?
8   A.   Correct.
9   Q.   All right.  And did you know, sir --
10       you looked at Mr. Power's deposition
11       transcript in connection with this
12       case, correct?
13  A.   Yes.
14            MR. FRIDAY:  Excuse me.
15       Objection to form, argumentative.
16  BY MR. BETKE:
17  Q.   Okay.  You know what, we'll try to
18       pause a little bit more to give Pete a
19       chance to weigh in.  He's driving so we
20       want to be fair to him.
21  A.   We want to keep his eyes on the road.
22  Q.   Yeah, yeah.
23  A.   And certainly hands free.
24  Q.   Gotta be hands free.
25            Okay.  So you understand that

Page 28

1        Mr. Power's deposition was taken in
2        this case, correct?
3   A.   That's my recollection, yes.
4   Q.   Do you know from his deposition whether
5        he owned an EliteBook previously?
6   A.   I do not know.
7   Q.   Do you know whether at the time his
8        deposition was taken whether plaintiff's
9        theory in this case was that there was
10       a third-party battery in the HP
11       EliteBook or whether it was an original
12       HP Elite battery?
13  A.   I believe the battery was third party.
14  Q.   Okay.  All right.  So I want to be
15       clear.  At the time his deposition was
16       taken, do you know which theory the
17       plaintiff was pursuing, i.e., was it,
18       A, there was an HP -- defective HP
19       approved battery in it, or B, a
20       nonapproved third-party battery?
21            MR. FRIDAY:  Objection to
22       form.
23  A.   There's a third position which is that
24       it's an HP compatible and HP -- I don't
25       know about the word approved, but they

Page 29

1        work with third-party manufacturers to
2        create batteries that would fit in the
3        EliteBook that were not manufactured by
4        AP (sic) or Sony specifically for HP.
5   Q.   Okay.  All right.  So yeah, I
6        thought there -- let me see if -- I
7        want to clarify things because I think
8        there's some confusion about terms that
9        are being used both in your report and
10       how I would use them.
11  A.   Sure.
12  Q.   So you understand -- do you want to
13       have an understanding one way or the
14       other whether HP is a battery pack
15       manufacturer?
16  A.   They manufactured the battery back I
17       believe or the battery adapter.  The
18       battery pack that contained the lithium
19       ion battery was not manufactured by HP.
20  Q.   Okay.  But I'm talking generally.  Does
21       HP -- and I'm going to ask you about
22       your use of the term battery pack
23       adapter because I don't know what that
24       means.  So I'm going to ask you about
25       that in a moment.

Page 62

1  you say somebody else.  Approved HP
2  batteries can come from somebody else,
3  but they're approved by HP but they
4  didn't come from HP in an HP battery
5  pack.
6  Q.   Right.
7  A.   Okay.  Great.  I think we're on the
8       same --
9  Q.   They're made by somebody else, meaning
10      somebody who is not approved to make
11      them for HP.
12 A.   Right.  Correct.
13 Q.   Okay.
14 A.   Perfect.
15 Q.   All right.  All right.  So when we get
16      to the top of page 10, you say:  HP is
17      well aware that third-party non-HP
18      approved batteries are used in HP
19      products and throughout the industry.
20             Just to make sure now we're
21      talking about the same thing, I wanted
22      to ask specifically about that sentence
23      and then say what is your basis to --
24      of belief that HP was well aware that
25      nonapproved HP batteries were used in

Page 63

1       HP products and throughout the
2       industry?
3  A.   Okay.  Go back one page to page 9.
4  Q.   Okay.
5  A.   Go to the fourth bullet point.
6  Q.   Yes.
7  A.   HP engineers say they are aware that
8       non-HP approved battery packs can fit
9       in the notebook.  That's how.
10 Q.   Okay.  And so who -- who testified to
11      that and where?
12 A.   Well, you'll -- if you want to find
13      which engineer said it, we will have to
14      take a break again, and I will have to
15      find it.
16 Q.   All right.  So you can't -- you don't
17      have a reference to it in your report,
18      and you don't recall off the top of
19      your head; is that fair?
20 A.   No.  I -- I combined all the HP
21      engineers important points into that
22      section.  I did not -- I didn't say who
23      said it.  I can find it for you.
24 Q.   And you didn't cite the page either?
25 A.   No, I didn't.

Page 64

1  Q.   Okay.  So -- and then do you know when
2       this -- the Power notebook was
3       manufactured?
4  A.   You know, I don't.  I was trying to
5       find out.  I know he bought it in 2013
6       on eBay, but I do not know the date of
7       manufacture.
8  Q.   All right.  Are you -- do you know
9       whether or not any of the HP engineers
10      testified to that?
11 A.   I couldn't find it.
12 Q.   Okay.
13 A.   Now maybe somebody knows.  I don't know
14      and I couldn't find it in any of the
15      material.
16 Q.   And why -- why were you looking for it?
17 A.   Well, particularly in reference to
18      other dates in my report like 2008
19      where there seems to be available
20      authentication software to tell if it
21      was a, quote, unquote, counterfeit
22      battery.
23 Q.   Okay.
24 A.   So it's my understanding that it was
25      probably made before then.

Page 65

1  Q.   All right.  So I will represent to you
2       that the date of manufacture of the
3       Power notebook was August 18, 2009.
4       Okay?
5  A.   Uh-huh.
6  Q.   Is that yes?
7  A.   Yes, sir.
8  Q.   All right.  And you would agree with me
9       that if it was manufactured on that
10      date that means that the design of it
11      would have to have taken place sometime
12      before 2009, correct?
13 A.   I would say yes.
14 Q.   All right.  And -- but you don't have
15      expertise in notebook design or
16      manufacturing; and therefore, you don't
17      know how long before 2009 but certainly
18      before 2009?
19 A.   That's correct.
20 Q.   Products don't just materialize on the
21      market.  You've got to design them.
22      You've got to spec them.  You've got to
23      manufacture them, and then you can sell
24      them.
25 A.   Certainly -- right.  You've got to

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

18 (Pages 66 to 69)

Page 66

1  design them. You've got to go to the
2  producer. You know, it takes time.
3  Absolutely.
4  Q.  Okay. All right. But you don't know
5      how much time?
6  A.  I don't.
7  Q.  All right. Now you just mentioned in
8      your answer and you reference it in
9      your report that you believe that there
10     was authentication of pop-up
11     technology.
12         And I just want to try to
13     find that in your report. I believe
14     it's the bottom of page 11 that you're
15     referring to.
16 A.  Yes.
17 Q.  Am I right about that?
18 A.  You are correct.
19 Q.  Okay. And you wrote here -- I'm just
20     going to read it for the record, and
21     then I will ask you some questions
22     about it.
23         It says: Beginning in late
24     2008, HP notebook with Unified
25     Extensible Firmware Interface (UEFI)

Page 67

1  included pop-up message 605 -- Battery
2  Counterfeit Check Error when it detects
3  a non-HP battery. User is instructed
4  to contact HP.
5         Did I read that correctly?
6  A.  You did. And then go to the top of
7      page 15 and there's more to that.
8  Q.  All right. All right. Perfect.
9         I was just going to ask you
10     where the source of that was, so you
11     anticipated my question.
12 A.  I'm flipping ahead of you.
13 Q.  All right. It says here -- you
14     reference HP notebook PCs-601 or 60X
15     error displays on a black screen at
16     https://support.hp.com.
17        And then you reference: This
18     document pertains to HP notebooks with
19     the HP Unified Extensible Firmware
20     Interface (UEFI) beginning in late
21     2008.
22        And then you go on and say:
23     On startup, the computer performs a
24     battery check by examining the
25     remaining capacity of the primary

Page 68

1  battery as well as the capacity of any
2  secondary battery that may be
3  installed. If the system detects that
4  the storage capacity of the battery is
5  very low, it displays one of the
6  following alerts. And then it has some
7  alerts. Correct?
8  A.  Correct.
9  Q.  All right. And where is the part where
10     it alerts about -- it's at the bottom
11     of that page -- different --
12     differences between battery messages;
13     is that correct?
14 A.  Yes. It's typically the last bullet
15     point on that page, 605.
16 Q.  All right. And that says: Battery
17     Counterfeit Check Error, 605, a non-HP
18     battery was detected. If you purchased
19     the battery from a reseller, contact
20     HP. Is that correct?
21 A.  That's a direct quote from that
22     document.
23 Q.  All right. All right. And so your --
24     so the source of your belief that there
25     was pop-up technology that would alert

Page 69

1  someone to a counterfeit battery is
2  HP -- is support.hp.com as you
3  referenced here on page 15, correct?
4  A.  Yes, sir.
5  Q.  Okay. Do you have the specific address
6      where that would be located because
7      obviously that's like a general
8      website? Do you have the specific?
9  A.  I don't know. Let me see.
10 Q.  All right.
11 A.  It looks like I don't off the top of my
12     head, but I'd be happy to find it for
13     you and provide it to Mr. --
14     Mr. Friday.
15 Q.  Okay. Would that be something you
16     would have kept in your file so that
17     you could subsequently, you know,
18     locate it again?
19 A.  If you want to go off the record again,
20     I will look through my entire file.
21 Q.  No. Hang on one second. I was just
22     asking first if that is something that
23     you would typically keep in your file
24     so that you could locate it at a later
25     date and time?

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

19 (Pages 70 to 73)

Page 70

1  A.  Typically, yes.
2  Q.  Okay. So I would ask that you go
3      back -- not now. Go back and look for
4      it and provide it to Mr. Friday when
5      you find it. Okay?
6  A.  Absolutely. I'm going to make a note
7      right on my copy of the report.
8  Q.  All right.
9  A.  I will put a red flag on it. Find
10     reference. Okay.
11 Q.  Did you -- did you do anything, sir, to
12     ascertain to what extent there was a
13     market in 2008 and 2009 in nonapproved
14     batteries on the Internet?
15 A.  Not for those specific dates, no.
16 Q.  Okay. Now you understand that
17     Mr. Powers bought his EliteBook on
18     eBay?
19 A.  That's my understanding, yes, sir.
20 Q.  Do you know how much he paid for it?
21 A.  I do not.
22 Q.  Do you know how much a new EliteBook
23     would have cost in 2013?
24 A.  Not off the top of my head, no.
25 Q.  Do you know how much they would have

Page 71

1      cost in 2009 when they rolled off the
2      market?
3  A.  No, sir.
4  Q.  All right. So as you sit here today,
5      you don't know the price differential
6      between what Mr. Power paid and what
7      you pay to buy one new?
8  A.  I do not.
9  Q.  All right. And do you know -- and I
10     may have asked you this. And if I did,
11     I apologize. Do you know whether or
12     not Mr. Power ever owned an EliteBook
13     prior to this one?
14 A.  I do not know.
15 Q.  Do you know if he testified about that
16     at his deposition?
17 A.  If he did, he did. I just don't recall
18     it.
19 Q.  Okay. With respect to -- and I don't
20     know if I closed the loop on this, so
21     let me just revisit it. With respect
22     to warnings at HP that you're aware of
23     that HP provided to users of EliteBook
24     about using non-HP approved parts,
25     including battery packs, is it your

Page 72

1      understanding the only warning was to
2      use HP spares?
3  A.  Yes, sir. That's -- that's the only
4      one that I'm aware of.
5  Q.  Okay. And where -- where did that
6      appear?
7  A.  In the engineers' reports. Other than
8      that, I don't know.
9  Q.  No, I meant where was the warning
10     provided?
11 A.  Oh, in some of the documentation. I
12     don't specifically remember where. But
13     I'm agreeing with you that somewhere
14     that was provided.
15 Q.  Okay. So as you sit here today, do you
16     know whether that was in a user's
17     manual, on the product itself, or
18     otherwise?
19 A.  It wasn't on the product itself. It
20     would have been in some documentation
21     that HP generally provided with a new
22     computer.
23 Q.  Okay. So do you have an understanding
24     as you sit here today whether there was
25     any notification or warning that was

Page 73

1      provided on the product itself when it
2      left HP's hands?
3  A.  I don't believe so.
4  Q.  Okay.
5  A.  But if there is I will agree with you
6      there is. I just don't recall that.
7  Q.  Do you make reference to any such
8      warning in your report?
9  A.  No, sir.
10 Q.  All right. And so you believe it was
11     provided -- the warning that you
12     referenced about replace with HP spares
13     or words to that effect, that warning
14     as you understand it was in
15     documentation that would be provided to
16     the original purchaser; is that
17     correct?
18 A.  Or some place available on the
19     Internet, one or the other.
20 Q.  All right. Well, I was just going to
21     ask you that. Do you have an
22     understanding of whether that same --
23     those same user manuals and other
24     documentation would be available on the
25     Internet?

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

20 (Pages 74 to 77)

Page 74

1  A.  Absolutely.
2  Q.  Okay. And in fact, many of the things
3     you reference you just pulled off the
4     Internet, correct?
5  A.  You're absolutely right.
6  Q.  So anyone who had Internet access could
7     basically do the same thing you did
8     which is search and find these
9     materials, correct?
10 A.  Theoretically if you knew there was an
11    issue to search for because there's
12    tons of stuff on the Internet.
13 Q.  We know that.
14 A.  But it's there, okay. It's there.
15 Q.  And -- and some of the materials that
16    you referenced are simply at something
17    called HP.com, correct?
18 A.  Yes. HP has many different places you
19    can go.
20 Q.  All right.
21 A.  Including HP.com.
22 Q.  All right.
23 A.  If you knew what you were looking for.
24 Q.  Or if you just wanted to nose around
25    too. You don't have to be looking for

Page 75

1     something. You can just nose around
2     about your product, right?
3  A.  I find that to be in my own
4     experience -- it's not a technical
5     opinion -- very rare that somebody
6     would do that.
7  Q.  All right. You have no knowledge or
8     information about what, if anything,
9     the eBay seller who sold the notebook
10    computer, the EliteBook, to Mr. Power
11    may have done to it prior to selling it
12    to him, do you?
13 A.  I do not.
14 Q.  All right. And with respect to any
15    alleged pop-up technology, do you have
16    any knowledge or experience or
17    expertise regarding whether or not that
18    can be defeated by, you know,
19    aftermarket -- well, I don't want to
20    use that term, by nonapproved battery
21    manufacturers?
22 A.  In technical terms, not a clue.
23 Q.  Okay. Do you know whether or not the
24    issues that you contend Mr. Power
25    should have been warned about according

Page 76

1     to you he knew about?
2  A.  My impression is that he had no idea.
3  Q.  And what is that based on?
4  A.  Well, he -- he never opened up the
5     battery pack to look at it is my
6     understanding. And I don't think -- I
7     don't believe based on the research
8     that I've done and what's in his dep
9     that he had any idea what the battery
10    pack was.
11 Q.  No, but I'm asking about the things
12    you're saying he should have been
13    warned about.
14 A.  Oh.
15 Q.  I'm asking you do you have any idea or
16    did you undertake to ascertain whether
17    any of the things that you contend
18    Mr. Power should have been warned about
19    he had knowledge of separate and apart
20    from any warning?
21         MR. FRIDAY: Objection form.
22 BY MR. BETKE:
23 Q.  Go ahead.
24 A.  I am -- I am unaware.
25 Q.  You don't know one way or the other?

Page 77

1  A.  I do not. You'll have to ask him.
2  Q.  Okay. Well, you could have asked him;
3     could you not have?
4  A.  Well --
5         MR. FRIDAY: Excuse me.
6     Objection, argumentative.
7         THE WITNESS: Outside of his
8     deposition which you took or somebody
9     working with you took, I didn't did not
10    ask him any questions.
11 BY MR. BETKE:
12 Q.  You could have asked him questions;
13    could you not have?
14 A.  Is it theoretically possible?
15    Absolutely.
16 Q.  Well, I mean, you work for him. So you
17    could have asked him questions, right?
18         MR. FRIDAY: Objection,
19    argumentative, form. Come on.
20 A.  I'm sorry. Can you repeat that
21    question?
22 BY MR. BETKE:
23 Q.  Do you work -- you work for Mr. Power
24    in connection with this case, correct?
25 A.  Yes, sir.

Page 78

1  Q.  Was there anything preventing you from
2      asking Mr. Friday or someone else from
3      his office for access to Mr. Power to
4      ask him questions?  Yes or no?
5  A.  There was nothing preventing me.
6  Q.  All right.  You had mentioned earlier
7      something about a battery adapter.  Do
8      you recall saying that?
9  A.  Well, there's a power adapter.
10 Q.  Okay.
11 A.  And that's connected to the battery
12     that plugs into the wall.
13 Q.  Okay.  Do you believe that the AC
14     adapter --
15 A.  Okay.  Let's call it that, the AC
16     adapter.
17 Q.  Do you believe that the AC adapter
18     connects to the battery pack or to the
19     notebook computer itself or do you
20     know?
21 A.  Well, it connects to both.  The AC
22     adapter charges the battery so it has
23     to connect.
24 Q.  I'm talking about direct connection,
25     sir.

Page 79

1  A.  Engineering-wise I can't tell you.
2  Q.  You don't know?
3  A.  Absolutely not.
4  Q.  All right.  And you understand, sir,
5      that the notebook computer could be
6      used without a battery even in if it's
7      plugged into the AC adapter and the AC
8      adapter is plugged into the wall?  Do
9      you know that?
10 A.  In fact, in my report the level 17
11     customer service person said it's
12     recommended if you plug it in not to
13     have a battery in it.  But I didn't see
14     any place where they told the consumer
15     that.
16 Q.  Okay.  So is the answer to my question
17     yes, you understand the notebook
18     computer can be used without the
19     battery in it if you just plug it into
20     the wall and plug it into the notebook?
21 A.  I do.
22 Q.  Okay.  Do you know whether or not the
23     pop-up battery authentication software
24     that you reference in your report at
25     page 15 and I believe earlier on page

Page 80

1      11 --
2  A.  Right.
3  Q.  -- was in the original EliteBook when
4      it shipped from HP?
5  A.  I do not know.
6  Q.  Do you know whether or not the eBay
7      seller -- the person unknown, at least
8      as I sit here today -- maybe we have
9      that.  I don't know.  The eBay seller
10     to Mr. Power do you know whether that
11     person changed or did anything to the
12     original software that was included in
13     the EliteBook?
14 A.  I don't know if anybody did anything to
15     it.
16 Q.  We have no way of knowing because we
17     never talked to that guy, correct?
18 A.  Well, I have no idea.
19 Q.  All right.  So going back to page 10 of
20     your report under pertinent facts,
21     there's a section where it says:  HP
22     provides -- a bullet point.  I'm sorry,
23     not a section, a bullet point.
24             HP provides Material Safety
25     Data Sheets for third-party non-HP

Page 81

1      replacement batteries.
2              Did I read that correctly?
3  A.  Yes.
4  Q.  Now when you say they are non --
5      third-party non-HP batteries, you're
6      really referring to categories one and
7      two of your definition, which is OEM
8      and third-party HP approved batteries,
9      correct?
10 A.  Yes.
11 Q.  All right.  You're not referring to
12     nonapproved HP batteries, correct?
13 A.  I don't know if they do or they don't.
14     But I agree with you that I know that
15     they do to categories one and two.
16 Q.  Yeah.  Well, but my point is you're
17     making an affirmative representation in
18     your report.  So you can't make an
19     affirmative representation about
20     something you don't know about which
21     you just stated.
22              So the only thing -- the only
23     thing you're referring to in this
24     report are the items are HP approved
25     battery packs, correct?

Page 94

1  A.  Absolutely.
2  Q.  Can you identify those that relate to
3      information that you know is pre 2009?
4  A.  I can't.
5  Q.  Okay.
6  A.  On the HP website it doesn't -- it's
7      not clear to me when it was posted.
8  Q.  All right. So do you know whether or
9      not -- strike that.
10         So as you sit here today, you
11     cannot identify those portions of your
12     opinion that pertain to the time period
13     before the EliteBook was manufactured?
14     In particular I'm talking about
15     Mr. Power's -- before Mr. Power's
16     EliteBook was manufactured and that
17     which pertains to after.
18 A.  Well, you identified it very clearly.
19     HP says that the authentication on the
20     firmware came about in late 2008. I
21     have no idea when they started
22     manufacturing or when they started
23     including that in the premanufactured
24     units. I just don't know.
25 Q.  And just to be clear, sir, I didn't say

Page 95

1      it. I was reading from your report.
2  A.  I agree. I just don't know when it was
3      implemented. I only know it was
4      available according to HP in late 2008.
5      I have no opinion as to when this was
6      developed, when it was produced. I
7      have to leave that to somebody else.
8  Q.  But I guess what I'm talking about
9      though there is some other things. So
10     let's -- I mean, I'll will just go
11     through them.
12         You reference a -- on page 16
13     there is a community chat item that
14     was -- that was from 2012. So you have
15     a date there. So we know that that is
16     like from about 3 years after
17     Mr. Power's EliteBook was manufactured.
18         Do you see that?
19 A.  Absolutely correct.
20 Q.  All right. But then there's stuff like
21     third-party reseller --
22 A.  But I don't know -- can I -- can I just
23     finish?
24         I don't know that
25     recommendation didn't predate it. I

Page 96

1      only know that that's when it was
2      posted that I could find.
3  Q.  Correct. You have no idea when that --
4  A.  I have no idea. I have no idea.
5  Q.  Okay. And so if you look at, you know,
6      How to Perform -- at the top of that it
7      says: How to Perform an HP Laptop
8      Battery Replacement.
9          Do you see that?
10 A.  I do.
11 Q.  And there you have a -- you have a
12     quote purporting to be from HP.com
13     store.
14 A.  Not purporting to be. It is.
15 Q.  Well, I don't know. I'm not trying to
16     be rude. I have to say it that way
17     simply because I haven't --
18 A.  Okay. That's fair. That's fair.
19     That's fair.
20 Q.  Okay. But I'm not questioning your
21     integrity, sir. I want to be clear.
22 A.  I understand. No, no, no, I don't take
23     offense at all. You're drilling down
24     and that's your absolute right.
25 Q.  All right. So at the top of that you

Page 97

1      don't have a date for that.
2          Do you see that?
3  A.  I don't believe there was a date on the
4      website. It just was up now.
5  Q.  Okay. So you don't know, for example,
6      then when this would have been posted,
7      correct?
8  A.  I don't.
9  Q.  All right. In fact, this could have
10     been posted after Mr. Power's incident,
11     correct?
12 A.  Well, somebody might be able to get
13     into the metadata and find out, but I
14     can't do that.
15 Q.  All right. Okay. So you don't know?
16 A.  I don't know. All I know is that I
17     found it on hpstore.hp.com when I was
18     writing my report.
19 Q.  All right. And then if we go down
20     to -- it says: Third-Party Reseller
21     Documents.
22         Do you see that?
23 A.  I do.
24 Q.  And I mean maybe a quicker way to do
25     this -- and I mean, I'll do it either

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

26 (Pages 98 to 101)

Page 98

1   way.  But maybe just to make our lives
2   a little easier if you look down
3   through -- under third-party reseller
4   documents, are there any items -- and
5   that goes all the way to page 19 to
6   additional documents.  Are there any
7   items that as you sit here today you
8   can identify the date when that item
9   was put on the Internet?
10  A.   No, sir.
11  Q.   And therefore, with respect to my
12       earlier question, you don't know if
13       they were posted before the EliteBook
14       was manufactured, before the incident,
15       anything like that, correct?
16  A.   With my skill level, there's no way for
17       me to know that.  Maybe somebody else
18       can figure it out but I can't.
19  Q.   So these documents that you reference
20       from page 16, Third-Party Reseller
21       Documents, over to page 19 to where it
22       says Additional Documents as far as you
23       know they could have been posted after
24       Mr. Power's incident, before
25       Mr. Power's incident; you just don't

Page 99

1    know?
2    A.   I cannot ascertain that fact one way or
3         another.
4    Q.   Okay.  And then there's an item that's
5         called Additional Documents.  And
6         again, I'm just going to ask you to --
7         let's just look at those headed HP
8         Laptop Battery Troubleshooting Tips and
9         Dell Laptop Battery - Frequently Asked
10        Questions.
11            There's no date associated
12        with those two entries on your report.
13        And is it fair to say that as you sit
14        here today you don't know when they
15        would have been posted either?
16   A.   That's correct.
17   Q.   And therefore, they could have been
18        posted before or after this incident,
19        correct?
20   A.   I don't have the skills to find out.
21        Maybe somebody else does but I don't
22        know.
23   Q.   All right.  And then going over
24        there's -- there's a reference here
25        about computer and computer peripheral

Page 100

1    fires with a discussion of batteries.
2    And then it says a reference to an NFPA
3    August 2006 entry in your report,
4    correct?
5    A.   Correct.
6    Q.   And so that -- and then the following
7         items are from the CPSC website it
8         looks like.  And those are all dated.
9         So the date that is there is the date
10        you believe they were posted or
11        released, fair?
12   A.   No.  The date there is the date of the
13        CPSC recall.
14   Q.   Yeah, I'm saying that those items were
15        posted and released to the public.
16        That's --
17   A.   Oh, yeah.  Okay.  Yeah, sure.
18        Absolutely correct.
19   Q.   Yeah.  And with respect to the NFPA
20        item, that's not a recall notice, but
21        it's dated August 2006.  So that's when
22        you believe that was issued, correct?
23   A.   Correct.
24   Q.   Do you know, sir, whether any of these
25        items that you reference from the

Page 101

1    bottom of page 20 over to -- the sort
2    of bottom quarter of page 27 where it
3    says Warning Documents do you have any
4    idea whether any of those recalls or
5    warnings relate to battery cells that
6    were not approved for use in the
7    original product?
8    A.   I don't know.
9    Q.   All right.  All right.  And then --
10        let's see here.
11            All right.  Now just
12        directing your attention to page 27
13        where it says Warning Documents.
14   A.   Uh-huh.
15   Q.   And over to page 33 where it says
16        Discussion.
17   A.   Right.
18   Q.   All right.  Can you identify any of
19        those warning documents that you
20        believe or understand were intended for
21        use with notebook computers
22        specifically?
23   A.   Their general use to manufacturers,
24        distributors, and retailers, including
25        computer manufacturers.  They're not --

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

27 (Pages 102 to 105)

Page 102

1  they're not only for computer
2  manufacturers.
3  Q.  All right.  Do you know, sir, whether
4      or not there are other any standards
5      that pertain specifically to notebook
6      computers with respect to warnings?
7  A.  There are battery standards about
8      accessibility, and they have some
9      warnings in them, but not that I recall
10     otherwise.
11 Q.  All right.  Can you -- what you just
12     referred to can you give me the
13     reference for that?
14 A.  Boy, I could.  I can't right this
15     second, but I'm happy to find it for
16     you.
17 Q.  Okay.  Well, is it referenced in your
18     report at all?
19 A.  No, sir.
20 Q.  And so that, what you just referred to,
21     didn't play a role in your opinions,
22     fair?
23 A.  Correct.
24 Q.  Okay.  Are you aware as you sit here
25     today whether there are any industry

Page 103

1  standards or other guides regarding
2  warnings to be placed on either
3  notebook computers or battery packs for
4  a sale to consumers?
5  A.  I would have to go back and look.  I
6      can reference the standards for you.  I
7      could give them to Pete and -- but they
8      did not play a part in my opinion.
9  Q.  Okay.  If they exist, they were not
10     considered and used in your report,
11     correct?
12 A.  That's correct.
13 Q.  All right.  Now I believe you mentioned
14     that you looked but could not find any
15     indication that HP had tried to take
16     action against nonapproved -- sellers
17     of nonapproved battery packs and cells.
18         Did I get that correct or am
19     I wrong?
20 A.  I didn't say that but it's true.  I
21     don't know but I didn't say it I don't
22     think.
23 Q.  All right.  Okay.  Hang on one second.
24     Let me just see.  Maybe I misread it.
25         Here it is.  Okay.  On page

Page 104

1  13 if you look at your item number 5.
2  Just take a moment and read it to
3  yourself, and then I will ask you some
4  questions about it.
5          - - - -
6  (The witness reviewed the document.)
7          - - - -
8     THE WITNESS:  Okay.  Yeah,
9  yeah.  True.
10 BY MR. BETKE:
11 Q.  All right.  Hang on.
12         So the first sentence you
13     wrote:  There is no readily available
14     evidence that HP took corrective steps
15     to assist users in selecting only HP
16     approved replacement or spare battery
17     packs.
18         Did I read that correctly?
19 A.  You did.
20 Q.  All right.  And so that's a lot of what
21     you have been talking about already
22     today.
23 A.  Right.
24 Q.  And I think I misread this, so I'm
25     going to -- so you're not suggesting

Page 105

1  that HP hasn't tried to stop people --
2  we'll call them unscrupulous people
3  from selling nonapproved HP battery
4  packs and cells?  That's not what
5  you're saying here, correct?
6  A.  No, no, not at all.  HP very well may
7      be suing everybody to stop it.  I have
8      no idea.
9  Q.  All right.  And when you say there's no
10     readily available evidence that HP took
11     corrective steps to assist users in
12     selecting only HP approved replacement
13     or spare battery packs, what's the --
14     what's the basis of that?
15 A.  I could not find anything that would
16     help the consumers understand what an
17     HP --
18     COURT REPORTER:  I'm sorry.
19 Ray, can you delete -- can you put it
20 on mute?
21         - - - -
22 (There was a recess in the proceedings from
23     11:50 a.m. to 11:52 a.m.)
24         - - - -
25 BY MR. BETKE:

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

30 (Pages 114 to 117)

Page 114

| | | |
|---|---|---|
| 1 | Q. | T as in Tom? |
| 2 | A. | T-R-A-F-E. |
| 3 | Q. | Yeah, that's how I wrote it down. |
| 4 | | Thank you. |
| 5 | A. | Yeah. |
| 6 | Q. | And then I believe I asked you this, but I wanted to just make sure I got it right. And you said a few times that it's confusing because -- my words, not yours, on one hand HP is telling people we use third-party vendors but on the other hand only buy from HP. |
| 13 | | Did I get that right? |
| 14 | A. | You got that exactly right. |
| 15 | Q. | Okay. Where is it that HP tells people -- you know, what can you reference to me where HP has said we use third-party vendors? |
| 19 | A. | Okay. Let's go back I think to page 13. |
| 21 | | Yep, there it is. The HP official site. We take safety very seriously, and we provide safety data sheets about third-party non-HP batteries used in HP products and |

Page 115

1 throughout the industry.
2 HP to their credit works with
3 third-party providers to make sure the
4 batteries are approved by HP and
5 therefore compatible. I think that's
6 terrific. But I'm still confused
7 whether they're saying you should only
8 buy from us or you could buy one of
9 our -- from one of our third parties
10 that we work with. They seem to
11 contradict themselves. That's all.
12 Q. All right. So what you're referring to
13 starts at the bottom of page 13 and
14 goes over to the top of page 14,
15 correct?
16 A. That is correct.
17 Q. That's the statement?
18 A. That's the statement.
19 Q. Okay. All right. Let me see what else
20 I've got here.
21 A. I hope not much.
22 Q. Did you -- did you review the opinion
23 of Mr. Kutchek in connection with this
24 case?
25 A. Yes.

Page 116

1 Q. Did that play any role in your opinion?
2 A. He cited some facts. Nothing he said
3 from an engineering point of view had
4 anything to do with my opinions.
5 Q. Okay. And what about the stuff that he
6 wrote about different patent
7 applications and things of that nature?
8 A. Not anything that impacted my opinion.
9 Q. Okay. And did you do anything to
10 determine -- independent research to
11 determine what, if any, the problem --
12 strike that.
13 Did you do any research to
14 determine if, in fact, there was a
15 problem with nonapproved batteries
16 being used in notebook computers in and
17 around 2008 and 2009?
18 A. No, sir.
19 Q. Okay. Do you have an understanding at
20 what point in time there became a
21 problem with nonapproved batteries
22 being used in notebook computers
23 whether they be Dell, HP, or Toshiba or
24 any? Do you have -- do you have an
25 idea when that became an industry

Page 117

1 problem?
2 A. Not exactly. But when you look at the
3 recalls, some of the problems are with
4 OEM or HP approved batteries and some
5 are not. I don't know the percentages.
6 But it can happen with an approved
7 product, and it can happen with an
8 unapproved product.
9 Q. All right. I -- I thought I asked you,
10 but I will ask you again just to make
11 sure because I think what you just said
12 led me to think that maybe I got it
13 wrong.
14 Can you identify in the
15 recalls that you referenced any that
16 involved so-called nonapproved
17 batteries, meaning they were not
18 approved by the manufacturer of the
19 notebook computer being part of the
20 recall?
21 A. It's not stated such in the recalls.
22 Q. You do not know --
23 A. It just said they're recalling the
24 units because there are fires. It
25 doesn't say whose battery pack was in

**NETWORK DEPOSITION SERVICES**
**Transcript of William Kitzes, J.D.**

32 (Pages 122 to 125)

Page 122

1  all models of that notebook regardless
2  of what battery pack or cell was in it;
3  is that correct?
4  A.  That's correct.  There's no
5  differentiation as -- they know who the
6  OEM was.  But the commission has no
7  indication as to what battery packs
8  were in the ones that caught fire.  So
9  they are just recalling all the HP
10 model numbers regardless of battery
11 pack that's in the specific computer.
12 That's correct.
13 Q.  That's your understanding?
14 A.  That's my understanding.
15 Q.  Okay.  Correct.  All right.
16         Are you aware of the UL
17 standard for notebook computers?
18 A.  I'm only aware that there is one.
19 Q.  Do you know the number of the standard
20 that applies to consumer electronic
21 products like notebooks?
22 A.  Note off the top of my head, no.
23 Q.  Do you know if it contains any
24 requirements regarding warnings to be
25 provided with the computer?

Page 123

1  A.  Sometimes they do.  Sometimes they
2  don't.  Honestly I don't know.
3  Q.  You haven't looked at it?
4  A.  I haven't.  It doesn't impact my
5  opinion.
6  Q.  All right.  And what about -- the same
7  question.  Do you know if with respect
8  to at least the original battery pack
9  do you know what UL standard applied to
10 it?
11 A.  Nope.
12 Q.  Same with -- same question but with
13 cells?
14 A.  No.  That's all the engineers' issues,
15 not mine.
16 Q.  All right.  Do you know whether either
17 the UL standard for battery packs or UL
18 standard for battery cells contained in
19 it any warning, requirements, or
20 suggestions?
21 A.  I do not know.  And I have no opinion
22 as to whether or not they complied with
23 whatever might be in there or not.  It
24 just doesn't impact my --
25 Q.  You can't offer an opinion about

Page 124

1  something you haven't looked at,
2  correct?
3  A.  Correct.
4  Q.  Do you offer any opinions about whether
5  authentication technology was industry
6  standard in or around 2009?
7  A.  There was a discussion of it in some of
8  the engineering reports.  I just know
9  what I read on HP's websites and that
10 is that in late 2008 it was possible.
11 Q.  All right.  That's -- that's the sum
12 and substance of your knowledge in that
13 regard, correct?
14 A.  Absolutely correct.
15      MR. BETKE:  All right.  I
16 don't have any further questions.
17 Thank you, sir.
18      THE WITNESS:  Thank you,
19 Mr. -- say your last name again.
20      MR. BETKE:  Betke.  Betke.
21      THE WITNESS:  Betke.  I was
22 going to say Chris but that's too
23 informal.
24      MR. BETKE:  No, that's okay.
25      THE WITNESS:  Chris, I

Page 125

1  appreciate it.
2              - - - -
3           EXAMINATION
4              - - - -
5  BY MR. FRIDAY:
6  Q.  Okay.  We're back here.
7         Bill, Mr. Kitzes, did
8  anything that was raised in questioning
9  from Counsel today change any of the
10 opinions that you expressed in your
11 report in this matter?
12 A.  No, sir.
13 Q.  And can you explain for us why not?
14 A.  Because I just -- in answers to Chris's
15 questions, I just explained what was in
16 my report.  Nothing changed.
17      MR. BETKE:  I thought you
18 were going to say they were dumb
19 questions.  That would've hurt.
20      THE WITNESS:  I would never
21 say that.  There's no such thing as a
22 dumb question.
23      MR. FRIDAY:  Okay.  I don't
24 have anymore questions.
25      MR. BETKE:  All right.  Thank