```
 1           IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                         - - -

 4   THOMAS POWER,                )
                                  )
 5                  Plaintiff,    )
                                  )
 6           vs.                  )No.
                                  )2:17-cv-00154-MRH
 7   HEWLETT-PACKARD COMPANY,     )
                                  )
 8                  Defendant.    )

 9                         - - -

10      Videotape Video Conference Deposition of
                KENNETH J. KUTCHEK, P.E.
11
                Tuesday, January 4, 2022
12
                          - - -
13
          The videotape video conference deposition of
14   KENNETH KUTCHEK, P.E., called as a witness by the
     defendant, pursuant to notice and the Federal Rules of
15   Civil Procedure pertaining to the taking of
     depositions, taken before me, the undersigned,
16   Lance E. Hannaford, Notary Public in and for the
     Commonwealth of Pennsylvania, via Zoom, commencing at
17   10:09 o'clock a.m., the day and date above set forth.

18                        - - -

19          NETWORK DEPOSITION SERVICES
              SUITE 1101, GULF TOWER
20           PITTSBURGH, PENNSYLVANIA
                 866-565-1929
21
                          - - -
22

23

24

25
```

```
 1   APPEARANCES VIA VIDEO CONFERENCE:

 2       On behalf of the Plaintiff:

 3           Friday & Cox:
             Josh Licata, Esquire
 4           1405 McFarland Road
             Pittsburgh, Pennsylvania  15216
 5           jlicata@fridaylaw.com

 6       On behalf of the Defendant:

 7           Coughlin & Betke:
             Christopher Betke, Esquire
 8           17 S. Federal Street, Suite 1450
             Boston, Massachusetts  02110
 9           cbetke@coughlinbetke.com

10   ALSO PRESENT:

11     Joseph Hagan, Videographer

12                   - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:17-cv-00154-MRH   Document 166-3   Filed 05/27/22   Page 3 of 98

NETWORK DEPOSITION SERVICES
Transcript of Kenneth J. Kutchek, P.E.

3

```
 1                        I-N-D-E-X

 2  EXAMINATION BY:                            PAGE:

 3  Mr. Betke                                  5, 94

 4  Mr. Licata                                   90

 5

 6  EXHIBIT:                                  MARKED:

 7  Exhibit 1 - Expert report, CV, list of testimony  7

 8          (Exhibit Retained by Counsel)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

4

1           VIDEOGRAPHER:  Good morning.

2           Today is January 4th, 2022.

3           This is the videotape deposition of

4    Mr. Kenneth Kutchek taken in the matter of Thomas

5    S. Power versus Hewlett-Packard Company.

6           It has a case number of 2:17-CV-00154-MRH.

7           Our deposition is being held remotely, with

8    our witness located at 596 Longpointe Drive, Lake

9    Orion, Michigan, with a zip code of 48362.

10          My name is Joe Hagan.  I'm the

11   videographer.

12          Our court reporter is Lance Hannaford.

13          Counsel attending remotely may now identify

14   themselves and who they represent.

15          MR. BETKE:  I am Christopher Betke.  I

16   represent HP.

17          MR. LICATA:  Josh Licata on behalf of the

18   plaintiff Thomas Power.

19          VIDEOGRAPHER:  If our court reporter would

20   please swear in the witness, we may begin.

21                    _ _ _

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

```
 1                  KENNETH KUTCHEK, P.E.

 2   called as a witness by the defendant, having been

 3   first duly sworn, as hereinafter certified, was

 4   deposed and said as follows:

 5                  EXAMINATION

 6   BY MR. BETKE:

 7       Q    Good morning, Mr. Kutchek.  I represent HP

 8   in this case.  First of all, am I getting your name

 9   correct?

10            Am I pronouncing it correctly?

11       A    No.  It is, actually, Kutchek.

12       Q    Kutchek.  All right.  Thanks.  I'm glad I

13   asked.

14            First of all, I don't expect to be terribly

15   long today.  Some of that depends on your answers.

16   But I just want to lay out some groundrules.  I know

17   you had your deposition taken before.  Just to make

18   sure we are operating on the same page.

19            First and foremost, if you need to take a

20   break for any reason, to use the restroom, get a glass

21   of water or coffee, please let me know.  I would only

22   ask that you answer any question in front of you

23   before we take a break.

24            Okay?

25       A    Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

6

```
 1        Q      In addition, if there is at any point in
 2    time I ask a question that you do not understand,
 3    obviously there is no way for me to know what is going
 4    on in your head, unless you tell me that.  So please
 5    tell me if you do not understand any of my questions,
 6    that way I can explain or rephrase it.
 7              Okay?
 8        A      Yes.
 9        Q      Josh, are we going to reserve objections
10    except as to form and motions to strike until time of
11    trial?
12              MR. LICATA:  That is what I was expecting.
13    Yes.
14        Q      Would the witness like the opportunity to
15    read and sign the transcript?
16        A      Yes.
17        Q      You understand, sir, everything that you
18    say today will be taken down into a transcript.  And
19    actually is being recorded.  So please understand that
20    everything you say will be on the record, unless we
21    make it expressly clear we are going off the record.
22    Do you understand?
23        A      Yes.
24        Q      Now, just a matter of housekeeping.  I have
25    in front of me what was marked Exhibit A in
```

1    plaintiff's expert disclosure.  That consists of the

2    expert report with statement of compensation and

3    attachments, your CV and testimony list.

4              Do you have that, sir?

5       A    I don't have that specific document.  But I

6    have my report, my CV, and my testimony list.

7       Q    So you don't have it in the form of, quote,

8    unquote, "Exhibit A" to the expert disclosure.  But

9    you have those items.

10             Is that fair?

11      A    Correct.  Yes.

12      Q    So just to make sure we are operating on

13   the same page, the reports I am looking at is dated

14   March 16, 2020.  Is that the report you are looking

15   at?

16      A    Yes.

17      Q    All right.

18             So Josh, if it is agreeable with you, just

19   as a matter of housekeeping, we will mark that batch,

20   your Exhibit A, as Exhibit 1 here.  And we will get it

21   to Mr. Hannaford after the fact rather than stop and

22   do that now.  Is that okay?

23             MR. LICATA:  Fine with me.

24             (Thereupon, Exhibit No. 1 was marked for

25        identification.)

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

8

```
 1        Q     So just for your purposes, Mr. Kutchek, the
 2   following will be Exhibit A, your expert report with
 3   statement of compensation and attachments -- I'm
 4   sorry, Exhibit 1.  Expert report with statement of
 5   compensation and attachments, your CV and testimony
 6   list.
 7              Okay?
 8        A     Yes.
 9        Q     So if I am referring to your report, it
10   will be the report we just identified as the March 16,
11   2020 report.
12              If I refer to your CV -- let me make sure
13   we are operating on the same page -- I have a CV here
14   that begins with your professional experience at
15   Robson Forensic beginning in 2015 to present as an
16   associate.
17              Is that your CV?
18        A     Yes.
19        Q     Then your list of testimony is two pages
20   beginning with testimony on page 1, 7-9-20, in reverse
21   chronological order to 11-2-15.  Is that what you are
22   showing on your end, too?
23        A     Yes.
24        Q     Sir, please state your name for the record?
25        A     Kenneth Kutchek.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

9

1      Q      Where do you work?

2      A      Robson Forensic.

3      Q      Is there anything -- just to short circuit

4    things a little bit, is there anything in your CV, you

5    can take a moment if you want to look at it, that you

6    believe as you sit here today is either inaccurate or

7    incorrect, that you would like to alert us to?

8      A      No.  Not that I am aware of.

9      Q      All right.

10            Is there anything that you consider of

11   import or significance to the opinions that you

12   rendered in this case that is not on your CV?

13     A      No.

14     Q      Just to clarify, in other words, if you had

15   some sort of unique certification or training, or

16   something that you feel you want to bring to bear to

17   this case, but it's not listed on your CV, I would

18   like you to tell me that.

19     A      Okay.

20     Q      Is there anything that falls into that

21   category that you can think of?

22     A      No.

23     Q      How much have you billed to date on this

24   particular file?

25     A      I don't know.  I don't have the billing

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

10

```
1    records.

2         Q     How many hours have you worked on this?

3         A     I don't recall.

4         Q     Can you estimate at all?

5         A     No.  I can't.

6         Q     So as you sit here today, you do not know

7    how much time you have worked on this particular case.

8    Is that fair?

9         A     If you have a copy of the billing records,

10   it should be reflected in the billing records.

11        Q     I do not have a copy of those.  There was

12   no trick to this.  If I had it, I wouldn't have asked.

13              Did you work more or less than 20 hours?

14   Let's try that as an estimate.

15        A     I really don't know.  It might be in the 20

16   to 30 range.  I thought I supplied billing records

17   when I submitted my report.

18        Q     You may have.  I just don't have them.

19        A     Okay.

20        Q     When did you start your work on this case?

21        A     It was January 2019.

22        Q     How was it that you were retained?  I'm not

23   asking for specifics of communications, but just

24   basically were you contacted by Mr. Licata's office,

25   or some other method?
```

1       A       I don't know if Josh just called me
2    directly, or called my office and was referred to me.
3       Q       Have you worked with Mr. Licata or the firm
4    that he is with, Friday & Cox, previously?
5       A       Yes.
6       Q       Approximately how many times have you
7    worked with his firm previously?
8       A       It might be about four or five times.
9       Q       Over what period of time would that be,
10   four or five times over how many years?
11      A       Since 2015.  So six years.
12      Q       Is it fair to say since you started with
13   Robson Forensic is when you started working for his
14   firm, in the occasions you talked about?
15      A       Yes.
16      Q       Without going into detail, can you just
17   tell me, were they product cases, or some other types
18   of cases?
19      A       I think most, if not all of the other ones,
20   are electric shock type situations.
21      Q       Do any of the other cases you worked for
22   Mr. Licata's firm involve notebook computers,
23   printers, or lithium ion batteries?
24      A       No.
25      Q       So when you began your work in January of

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

12

1    2019 -- strike that.  Let me back up.

2              We have your report that is dated March 16,

3    2020.  Did you prepare any other reports in connection

4    with this case?

5              I'm not asking about drafts of this report.

6    I'm just really asking, is there another report out

7    there that sets forth opinions or findings that is

8    supplemental or different from this report?

9        A    No.  That is the only report.

10       Q    If you go to page 16 of your report, there

11   is a list of findings.  Do you see that?

12       A    Yes.

13       Q    Is it fair to say that these nine items

14   represent a summary of your opinions in this case?

15       A    Yes.

16       Q    Do you have any opinions or findings that

17   aren't set forth in summary on page 16?

18       A    The only other findings would be after

19   reading your two expert reports.

20       Q    All right.

21             Let's just talk about your work as opposed

22   to your responses to my experts' work.  We will get to

23   that in a moment.

24             But your initial opinions in sum and

25   substance are set forth on page 16, 1 through 9.

1    Correct?

2        A    Yes.

3        Q    Did you do any work of significance in

4    reaching your opinions on page 16, that is not

5    reflected in your report?

6        A    No.

7        Q    Did you incur any expenses in connection

8    with your work on this report?  Let me put it to you

9    this way.  Maybe a better way of putting it, did you

10   incur any expenses in connection with doing your work

11   for this case?

12       A    Probably the only expenses would be travel

13   expenses to go to Pittsburgh to see the laptop and

14   inspect it.

15       Q    Presumably there were probably some

16   incidental expenses for postage and copying, and

17   things of that nature.

18            Correct?

19       A    No.  Nothing like that.  Just travel

20   expenses.

21       Q    Now, just for a little nomenclature

22   purposes.  First of all, you understand that the

23   notebook, the type of notebook at issue in this case

24   was an Elitebook 8730W.  Is that correct?

25       A    I will just refer back.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

14

```
 1       Q      Sure.  You are referring to your report,
 2  sir?
 3       A      Yes.
 4              Yes.  That is it.
 5       Q      So for ease of reference today, if you
 6  don't mind, sir, I will refer to that as just the
 7  Elitebook.  Will you understand for purposes of today,
 8  that when I refer to the Elitebook, I am referring to
 9  the model Elite book 8730W; fair?
10       A      Yes.
11       Q      And then for -- also, just for nomenclature
12  purposes, for ease of reference, when I am referring
13  to the specific notebook, the artifact, if you will,
14  that Mr. Power had, I am going to call that the Power
15  notebook.
16              Is that okay with you?
17       A      Sure.  Yes.
18       Q      You will know when I am specifically
19  talking about Mr. Power's notebook, the thing that was
20  involved in the incident, and when I am talking
21  generically or about the model of the Elitebook.
22  Fair?
23       A      Yes.
24       Q      With respect to the Power notebook, do you
25  know when it was manufactured?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

15

```
 1      A     I don't recall.  I think 2008 comes to
 2   mind.  But I don't recall.
 3      Q     I don't know if you have access.  I know
 4   you reference -- on page 1 of your report you
 5   reference the items you reviewed in connection with
 6   this matter.  Do you see that?
 7      A     Yes.
 8      Q     Is there anything you reviewed in
 9   preparation of your report that is not referenced in
10   item B?
11      A     No.
12      Q     In fairness to you, you reference some
13   patent applications and things.  You reference those.
14   But case materials, the case materials that you
15   reviewed are set forth in item B, page 1.
16            Correct?
17      A     Yes.
18      Q     You reference HP production 001-5238.
19   Those are the Bates stamp numbers.  Do you understand
20   that?
21      A     Yes.
22      Q     I don't know if you have access to them.
23   But if you do, and if you don't, I will help you out,
24   but if you do, if you look at HP2466, you will see the
25   actual details with respect to the Power notebook.  It
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

16

1   indicates it was manufactured in August of 2009.  Does

2   that sound about right to you?

3        A     Yes.  About right.

4        Q     You said 2008.  Pretty close off the top of

5   your head.  You certainly don't have any reason to

6   dispute the date set forth in Bates stamp 2466, do

7   you?

8        A     No.

9        Q     And you would agree with me, sir, would you

10  not, if it was manufactured in 2009, that the process

11  of planning and designing the Elitebook would have

12  occurred at some time before August of 2009.  Right?

13       A     Yes.

14       Q     Would you agree that would mean the

15  Elitebook itself was probably planned and designed

16  some time in 2007 or 2008?

17       A     Yes.

18       Q     Do you hold any professional licensure?

19       A     Yes.  I am a licensed professional engineer

20  in multiple states.

21       Q     What states are you licensed in?

22       A     I think there is 28 of them.  You want all

23  of them?

24       Q     No.  No.

25             Are they in your CV?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

17

```
 1        A      Yes.  They are.

 2        Q      And what is your licensure in?  What

 3   specific engineering field?

 4        A      Most states they just call it a

 5   professional engineer.  But my degree is in electrical

 6   engineering.

 7        Q      Do you have any professional background in

 8   computer design?

 9        A      The application of computers, but not the

10   design of computers.

11        Q      In other words, have you ever worked

12   designing computers?

13        A      No.  I haven't.

14        Q      And have you ever -- have you ever worked

15   in computer manufacturing?

16        A      No.

17        Q      Has your professional engineering work been

18   in the forensic field mostly?

19        A      No.  Just the last six years.

20        Q      Prior to that, what did it consist of,

21   generally?

22        A      I did various roles in electrical

23   engineering, in primarily manufacturing, industrial

24   environments.

25        Q      What types of things were being
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

18

1   manufactured in those environments?

2       A    All different things.  Cars, planes,

3   wastewater systems, concrete.  Just a wide variety of

4   different end products.

5       Q    All right.  Do you have any professional

6   background in battery pack design?

7       A    No.  I have never designed battery packs.

8       Q    How about in cell, battery cell design?

9       A    No.

10       Q    Same question with respect to battery pack

11   cell -- battery pack and cell manufacturing, any

12   background in that?

13       A    No.

14       Q    How about professional background in

15   printer design?

16       A    No.

17       Q    Same question with respect to printer

18   manufacturing?

19       A    No.

20       Q    Have you ever written any peer reviewed

21   articles about notebook computers, lithium ion

22   batteries, or printers?

23       A    No.

24       Q    Have you ever qualified in any court as an

25   expert in human factors?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

19

```
 1        A      No.

 2        Q      Do you hold yourself out as an expert in

 3   human factors?

 4        A      Not specifically in human factors.  But

 5   sometimes in the interaction of a person with items

 6   that are electrical engineering related.

 7        Q      How about have you ever qualified as an

 8   expert in the field of warnings, product warnings?

 9        A      Not specifically warnings and instructions.

10   But again, I have offered opinions on warnings related

11   to electrical engineering, electrical and electrical

12   engineering related topics.

13        Q      Have you ever offered any -- have you ever

14   qualified, let's talk about in court, have you ever

15   testified -- let me ask this.  Have you ever testified

16   at a trial?

17        A      No.  I haven't.

18        Q      Is it fair to say with respect to any

19   topic, regardless of the topic, you have never been

20   qualified as an expert to testify in court.  But you

21   have offered opinions in cases, but that never reached

22   court.  Is that fair?

23        A      Correct.  It wasn't about being qualified

24   or not qualified.  It's just that all of the trials

25   have been cancelled and settled prior.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

20

```
1        Q      I think I am using a term of art maybe you
2    are not familiar with.  The idea of when I ask, just
3    so you understand my question, when I ask if you
4    qualified to testify at trial, it means you have taken
5    a witness stand, you have gone through your
6    qualifications, and the lawyer asked the court to
7    accept you as an expert, and the court said yes.
8               I'm asking whether that has ever happened
9    before with you.  And I understand, because you never
10   testified at trial, that has never happened before.
11   Correct?
12       A      Correct.
13       Q      Have you ever been subject to a Daubert
14   challenge?
15       A      No.  Not that I am aware of.
16       Q      Is your current work solely forensic in
17   nature?
18       A      My current work with Robson Forensic is
19   solely forensic.  I do have my own company, Dynamo
20   Engineering, which is on my resume, which I do some
21   electrical engineering consulting that is not forensic
22   related.
23       Q      What is that electrical engineering
24   consulting you do that is not forensic related to,
25   what type of work?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

21

```
 1      A     It typically involves industrial machinery,

 2   and automation and safeguarding of that machinery and

 3   equipment.

 4      Q     You have a list of testimony we referenced

 5   earlier to just identify it.  It is attached to what

 6   we are going to mark Exhibit 1.  Are any of the cases

 7   referenced, do any of the cases referenced in your

 8   list of testimony, do any of them involve notebook

 9   computers?

10      A     No.

11      Q     Do any of them involve lithium ion

12   batteries?  Maybe I can make it easier for you.  I

13   don't mean that there happened to be a lithium ion

14   battery.  Is a lithium ion battery the subject of the

15   case?

16      A     I understand your question.  And the answer

17   is no.  I take that back.  Yes.  That would be the one

18   dated 7-22-21.

19      Q     I don't have that on my list.  You may not

20   be looking at the same list.

21      A     This has gotten updated since.  I have had

22   depositions since then.  So they have been added.

23      Q     So hang on one second.  In fairness to you,

24   I am going to make sure you are looking at the same

25   thing.  Let's backtrack one second.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

22

```
 1        A     Okay.

 2        Q     Setting aside the issue of what is on your

 3   list of testimony, I am just going to go back over

 4   these prior questions.  Have you rendered any opinions

 5   in any cases that involve notebook computers besides

 6   this one?

 7        A     No.

 8        Q     Same question with respect to lithium ion

 9   batteries.  I guess you are going to say this 7-22-21

10   case.

11              Is that correct?

12        A     Yes.  That would be the only one.

13        Q     What is the name of that case?

14        A     It was DJ Auto versus VL Systems.

15        Q     Where is that case pending?

16        A     It is no longer pending.  But it is in West

17   Virginia.

18        Q     And what was the lithium ion battery in

19   that case?  And what was the issue?

20        A     The summary of that case was there was a

21   fire in an auto shop.  It was believed that the

22   alignment machine that aligns wheels on cars, it

23   contained lithium ion batteries.  And one of the

24   battery cells exploded and started a fire.

25        Q     What side of the case were you on in that
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

23

1    case?

2          A      That one was plaintiff.

3          Q      All right.  Was that with Mr. Licata's

4    firm?

5          A      No.

6          Q      What was the name of the firm that you

7    represented, or that you worked with?

8          A      I don't recall the firm name.  I don't

9    recall the attorney's name either.

10         Q      We think we are so important.

11         A      I'm an engineer.  I focus on the technical

12   side.

13         Q      Just a few months later, Josh, they have

14   forgotten us.

15               What type of lithium ion battery was it in

16   that case?

17         A      It was a foil pack battery.

18         Q      That is not what is used generally in

19   notebook computers.

20               Correct?

21         A      Well, not this notebook computer.

22         Q      All right.

23               What type of battery is used in the

24   Elitebook?

25         A      They have a series of 18650 cells.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

24

```
 1        Q     Unlike the foil pack, the lithium ion
 2   battery, the casing of the 18650 cell is steel.  Is
 3   that not correct?
 4        A     That's correct.
 5        Q     Have you had any cases, in which you
 6   rendered opinions that involved printers?
 7        A     No.
 8        Q     Now, when you initially began work on this
 9   case in January of 2019, did you review the complaint?
10        A     I am sure I did.  Yes.
11        Q     Was it your understanding, when you first
12   began work on this case, that the plaintiff was
13   contending that the battery pack was original to the
14   HP product?
15        A     I don't recall the exact claims.
16        Q     Did you have an understanding, when you --
17   strike that.
18              When was the first time you actually looked
19   at the artifact in this case, the Power notebook and
20   the associated batteries?
21        A     I think it was September of '19.
22        Q     If you take a look at your report, it talks
23   about a visual inspection on Christmas Eve, believe it
24   or not, of 2019, did you look at something before
25   then?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

25

```
 1      A      Actually, I did just realize that is a
 2   mistake.  December 14 should be September 14th -- or
 3   September 24th it should be.  Not December 24th.
 4      Q      That would be a pretty bad way to spend --
 5   no offense.  But it would be a pretty bad way to spend
 6   your Christmas Eve.
 7             So if I am to understand your testimony,
 8   just to make it clear for the record, if I look at
 9   page 1 of your report, item 11, where it says computer
10   visual inspection on December 24th, 2019, that should
11   in fact say September 24, 2019.
12             Correct?
13      A      Yes.
14      Q      So as of September 24, 2019, you had an
15   opportunity to review the artifacts, the physical
16   evidence in this case.
17             Correct?
18      A      Yes.  On September 24th.
19      Q      Correct.
20             Did you -- what observations did you make
21   of it at that time?
22      A      I mean, it was just a visual inspection.  I
23   didn't disassemble it, or take anything apart.  I
24   mean, it was just obvious that the battery had an
25   incident, and multiple cells were involved.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

26

```
 1         Q     Let me back up.
 2               Why don't you just tell me everything you
 3     did in the process of rendering your opinions set
 4     forth in Exhibit 1.  Just generically.  Talk to me
 5     what you did.
 6               You don't have to give me like every
 7     specific detail.  Big picture, what did you do to
 8     reach the opinions that are set forth in Exhibit 1?
 9         A     It would be reviewing the information that
10     is listed in the report that was provided to me.  That
11     would be some of the HP documents, the deposition of
12     Power, and the deposition of the two HP persons.
13               There was a video.  I was provided some
14     photos taken by others.  And then I did my own
15     inspection.  I reviewed an x-ray that was done on the
16     battery -- on the laptop.  And then I reviewed the CT
17     scan that was completed on the laptop.
18         Q     And then you also -- just again in
19     fairness, you also did some searching of a patent,
20     presumably a patent database of some sort?
21         A     Yes.
22         Q     What database did you search?
23         A     I don't recall which database it was.  I
24     mean, it was -- I used Google to do that work.
25         Q     And aside from everything we just talked
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

1    about, is there anything of significance you did in

2    connection with your work to reach the opinions set

3    forth in Exhibit 1?

4        A    I don't understand the question.

5        Q    Besides everything you just said, is there

6    anything else of significance that you did in order to

7    render the opinions that are in Exhibit 1?

8        A    No.

9        Q    With respect to -- I note in your report,

10   you indicate that a visual exam of the Power notebook

11   cells indicate it was -- they are not Sony 18650

12   cells.

13            Correct?

14       A    I have to refer back to my report.

15       Q    Please do.  Maybe I can help you, if I can

16   find it.

17            Page 12, sir.  If you look at page 12.

18   Under "battery pack," one, two, three, four paragraphs

19   down.

20            Do you see that?

21       A    Yes.  I see it now.

22       Q    So in your report, just for the record I

23   will read it.  "Visual exam of Power's notebook

24   battery cells indicated battery cells do not appear to

25   be Sony 18650 cells."

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

28

```
 1                 Did I read that correctly?

 2        A     Yes.

 3        Q     And so when was it that you did that visual

 4   examination?  Is that the September 24, 2019 exam?

 5        A     That would be based on the visual exam and

 6   the x-ray and the CT scan.

 7        Q     When did you -- I am not trying to be

 8   difficult here.  It says visual exam of the cells.  It

 9   doesn't say of x-ray and CT scans here.

10        A     Okay.  Then it was based on visual exam.

11        Q     So that would have been the September --

12   just trying to get the date, because there was that

13   mix-up about December 24 and September 24th.  That

14   would have been a visual exam you did on September 24,

15   2019.

16                 Correct?

17        A     Yes.

18        Q     What about the visual examination caused

19   you to conclude they were not Sony cells?  What was it

20   that you observed that led to that conclusion?

21        A     The vent holes on the top of the cell have

22   a unique pattern based on some the manufacturers.

23        Q     Okay.

24                 So you could see on September 24th, 2019

25   that these were not Sony cells, because they didn't
```

1    look like Sony cells from the vent cap.

2           Correct?

3    A    Yes.

4    Q    And the significance of that, just to go

5    back to this document that I referred to earlier,

6    which was Bates stamp 2466, the significance of that,

7    as I understand it, and you correct me, if I am wrong,

8    was that the Power notebook shipped with Sony cells.

9    Correct?

10   A    I assume they did, because that is what HP

11   uses in their packs, yes.

12   Q    In fact, if you were to look at 2466, it

13   indicates, specifically, that the serial number for

14   the Power notebook is shown to have, as a component

15   part, an STL pack with Sony cells.

16          Correct?

17   A    Yes.

18   Q    You have no basis to dispute that

19   information.

20          Do you?

21   A    No.

22   Q    And so the import, as I understand it, for

23   purposes of this case, was as of September 24, 2019,

24   you became aware that the cells in the Power notebook,

25   as of the time of the incident, were not original to

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

30

1     the HP product.

2              Correct?

3        A     Yes.  I think Josh told me that earlier

4     than that.  So that confirmed it.

5        Q     When did you learn that from Josh earlier?

6        A     I don't recall.

7        Q     Just order of magnitude; was it days

8     before, months before, when you first got the file?

9        A     I mean, it was some time from the time I

10    started until September.  So in those nine months.

11       Q     Some time during the nine months.

12             Is there anything, sir, that you could look

13    at, your billing records, email, that would allow you

14    to determine when you were given that information from

15    Josh?

16       A     No.

17       Q     You didn't to any tests as such with

18    respect to your work, did you?

19       A     No.  I didn't.

20       Q     Do you know if the Elitebook was UL listed?

21       A     I don't recall specifically.  But I am

22    pretty sure it was.

23       Q     First of all, what is UL, sir?

24       A     Underwriter Laboratories is a third party

25    testing lab that, basically, certifies the design and

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

31

1    manufacturing of a product.

2       Q    Do you know what UL standard

3    governs consumer electronic products such as the

4    Elitebook?

5       A    Not offhand.

6       Q    Do you know if the battery pack and/or

7    cells that originally shipped with the Elitebook were

8    UL listed?

9       A    I don't recall.

10      Q    Do you know if there were any materials

11   provided to you, that would indicate that?

12      A    I think it may have been discussed in one

13   of the HP depositions.  And it would have been in the

14   HP production as well.

15      Q    Do you know what UL standard governs

16   lithium ion battery packs?

17      A    I don't recall the number.

18      Q    Have you ever read it?

19      A    Yes.

20      Q    Can you just tell me, for the record,

21   generally, what type of tests are done on battery

22   packs per the UL standard, the applicable UL standard?

23      A    I mean, there is overvoltage, undervoltage.

24   Discharge.  There is flammability tests.  It's a wide

25   range of tests.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

32

1      Q     And how about with respect to cells?  First
2  off, let me clarify.  Sorry.
3            What standard governs lithium ion cells,
4  what UL standard governs the testing of lithium ion
5  cells?
6      A     It's a different standard.  It's a separate
7  standard for individual cells.  Again, I don't recall
8  the exact number.
9      Q     All right.
10            Then what about what tests are done by
11  cells per the UL standard?
12      A     Again, I would have to refer to the
13  standard.
14      Q     You don't know -- as you sit here, you
15  can't remember them off the top of your head?
16      A     No.  I can't recall.
17      Q     All right.
18            Do you know what an exemplar is?
19      A     Yes.
20      Q     Just for the record, what is an exemplar?
21      A     An exemplar is a product similar to one
22  that may be involved in an incident.  And it is used
23  for comparison purposes.
24      Q     It's basically, for our purposes here
25  today, an exemplar of the Elitebook would be another

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

33

1    8730W.  Right?  That would be an exemplar, if you got

2    another one of those.  Correct?

3         A     Yes.  Well, it would be one that had a

4    similar age and condition as well.

5         Q     All right.

6               Did you obtain any exemplars in connection

7    with your work in this case?

8         A     No.  I didn't.

9         Q     Did you attempt to?

10        A     No.  I didn't.

11        Q     I think you answered this.  But I have it

12   on my list, so I will ask it anyway.  Did you

13   disassemble the Power notebook at all ever?

14        A     No.  I didn't.

15        Q     When you made the visual examination of the

16   cells from the Power notebook to determine whether or

17   not it was -- they were consistent with Sony cells,

18   what did you compare it to?

19        A     I mean, I have reference materials of

20   different cell manufacturers and compared it to that.

21        Q     Where did you find -- can you identify for

22   the record that reference material?

23        A     No.  It's just the various documents that I

24   collected over the years.  Because I have been

25   involved in other 18650 type incidents.

```
 1      Q     All right.

 2            I thought I asked you earlier if you had

 3   any other cases that you were involved in with respect

 4   to lithium ion batteries.  Let's just go back to that.

 5            When you say you have been involved in

 6   other 18650 incidents, how is that -- what did I ask

 7   wrong that did not get that in my last question?

 8      A     Your question was did I provide testimony.

 9   So the one that I listed was the one case where I did

10   provide a deposition.

11      Q     I thought I asked it differently after I

12   sort of rebooted.  Just to make it clear, with respect

13   to notebook computers, have you been involved in any

14   cases, whether or not you testified, regarding

15   notebook computers besides this one?

16      A     Notebook computers, no.

17      Q     I am going to get to -- I apparently messed

18   up.  So I'm going back to correct everything I did

19   just to make sure I didn't mess up.

20            With respect to printers, have you been

21   involved in any cases, whether or not you testified or

22   not, have you been involved in any cases involving

23   printers?

24      A     No.

25      Q     With respect to lithium ion batteries,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

35

1    aside from the case you referenced earlier, the West

2    Virginia case which involved lithium ion batteries,

3    have you been involved in any other cases involving

4    lithium ion batteries?

5          A    Yes.

6          Q    How many other cases?

7          A    20, 25.

8          Q    Have you ever -- have any of those gone to

9    the point where you actually rendered a formal

10   opinion, whether or not you testified, that you wrote

11   a report?

12         A    I think, if I recall, a couple of them may

13   have gone to report.  And the rest did not.

14         Q    Is it fair to say, with respect to the

15   rest, you were invited to a laboratory exam where

16   among other things a lithium ion battery or 18650

17   cells were considered as a possible cause of a fire?

18         A    No.  These were not all fire cases.

19         Q    I see.  All right.

20              What instances of lithium ion battery cells

21   non-fire were you involved in?

22         A    Well, when I categorize it as fire, one

23   which was an auto shop.  That was a significant fire

24   that involved a good portion of the building.

25              I have had quite a few cases, which I will

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

36

1   refer to as 18650 pocket cases.  And they are

2   typically involved in vape device situations.  Where

3   someone may have an 18650 in their pocket, and it

4   short circuits.  And either causes an explosion and

5   causes burns.

6       Q    So it's in that process in handling those

7   cases over the years, these vape cases, that you sort

8   of developed or got some information regarding what

9   different 18650 cells from different manufacturers

10  might look like?

11      A    Exactly.  Yes.

12      Q    All right.  Fair.  I understand now.

13           So in connection with that, that is how you

14  were able to determine for yourself that the artifact

15  cells, the ones from the Power notebook, were not

16  consistent with what Sony cells look like.  Correct?

17      A    Yes.

18      Q    Do you offer any opinions, sir, in your

19  report as to what caused the -- by the way, are you

20  familiar with the term "aftermarket battery"?

21      A    Yes.

22      Q    What do you want to call -- I will go with

23  your nomenclature.  What do you want to call the

24  artifact -- maybe we will just call them artifact

25  cells.

1            And you will understand these are the

2    non-HP batteries that you identified as not being --

3    the batteries you identified as not being Sony.  What

4    do you want to call them?  Just call them the artifact

5    batteries?

6        A    Well, there is only one battery.  But it

7    consists of multiple cells.

8        Q    Yes.

9        A    We can call it the subject battery pack.

10       Q    All right.

11            By the way, just for my nomenclature, when

12   I talk about the pack, I say pack.  When I talk about

13   the battery, I mean cells.  That is why I said -- you

14   said there is one battery.  I would say -- Chris

15   Betke -- there is one battery pack.

16       A    Yes.

17       Q    So you and I are clear, when I mean to talk

18   about the pack, I will say pack.  When I talk about

19   the cells, I will try to say cells.  But I may also

20   say battery.  If I don't say pack, I am not referring

21   to the pack.  I am referring to the specific items.

22   Okay?

23       A    Yes.

24       Q    I understand there may have been some

25   confusion there.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

38

1          Do you offer any opinion in your report as

2   to what caused the pack or cells to malfunction?

3      A    No.  I do not.

4      Q    Do you know, sir, and can you state for the

5   record the safety features of the Elitebook?

6      A    No.  I would have to refer back to some of

7   the HP documentation.

8      Q    Did you review the schematic that was

9   provided in this case?

10     A    I don't recall.  I mean, I did review all

11  of the documents that were provided.

12     Q    But as you sit here today, you cannot

13  recall whether or not you reviewed the schematic for

14  the Elitebook?

15     A    Correct.

16     Q    Did you do anything to try to determine who

17  manufactured the subject Power battery pack and cells?

18     A    No.  I didn't.

19     Q    Do you know, sir, whether a lithium ion

20  battery is different from a lithium battery?

21     A    A lot of times it is terminology.  People

22  may call them different things.  But they may be the

23  same thing.

24     Q    Can you describe -- state for the record,

25  and I am not asking you to go in gory detail, but can

NETWORK DEPOSITION SERVICES
Transcript of Kenneth J. Kutchek, P.E.

39

1    you generally state for the record how a lithium ion

2    battery works?

3         A    How it works?

4         Q    Yes.

5         A    It's just like any other type battery.  It

6    has an anode, it has a cathode.  And there is material

7    between the anode and cathode that is able to receive

8    a charge, and then transfer that charge back to the

9    anode and cathode when it is not in the charged mode.

10        Q    What are the critical components of a

11   lithium ion battery?

12        A    The critical components?

13        Q    Yes.  What are the key components of a

14   lithium ion battery?

15        A    Again, you have in this one case, you have

16   the can.  You have the top.  You have the anode.  You

17   have the vent.  You have -- it does have safety

18   protections.  The vent allows overpressurization to

19   release.  You have -- I don't know how else to go into

20   the manufacturing of the cell.

21        Q    Do you know -- can you describe the process

22   in how a cell might go into thermal runaway, or how it

23   goes into thermal runaway?

24        A    There is different things that can cause

25   thermal runaway.  It could be an external short

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

40

1    circuit, an internal short circuit.  It could be

2    overvoltage condition from overcharging.  It could be

3    from overdischarge, which would be a low voltage

4    condition.

5            So there is different means to cause the

6    thermal runaway.

7        Q    It can be caused by abuse as well, can it

8    not?

9        A    Yes.  Abuse is one as well.

10       Q    Have you ever talked to Mr. Power?

11       A    No.

12       Q    So you never interviewed him in connection

13   with your work on this case, correct?

14       A    No.  Just his deposition.

15       Q    You read his deposition?

16       A    Yes.

17       Q    And there was nothing preventing you from

18   talking to Mr. Power, in other words Josh never said

19   to you, "You can't talk to Mr. Power," did he?

20       A    No.

21       Q    Now, Mr. Power's deposition was taken in

22   July of 2018.

23            Correct?

24       A    I don't recall the date.

25       Q    I'm sorry, if you look at page 1 of your

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

41

```
 1   report, you have the date there.  That is where I just
 2   read that from.
 3        A     Okay.  Yes.  July 2018.
 4        Q     You weren't retained to work on this matter
 5   until after that, January of 2019.
 6              Correct?
 7        A     Correct.
 8        Q     Did you have any questions that came to
 9   mind that perhaps weren't answered by the deposition
10   of Mr. Power, that you wanted to ask him?
11        A     I don't recall.
12        Q     As you sit here today, can you think of any
13   questions that you would have liked to have asked
14   Mr. Power, if given a chance?
15        A     No.  Not that I recall.
16        Q     Directing your attention to page 16 of your
17   report.  You say there, if you look at item 1 of your
18   opinion, I will read it for the record.  "HP was aware
19   that non-HP approved battery packs were available for
20   sale by third party retailers, which could fit into
21   their HP notebooks."
22              Did I read that correctly?
23        A     Yes.
24        Q     And so first off, let me ask you.  What is
25   the basis for your assertion that HP was aware that
```

```
 1    non-HP approved battery packs were available for sale

 2    by third party retailers, which could fit into their

 3    HP notebooks?

 4        A    That came straight from the deposition of

 5    one of the HP individuals.

 6        Q    So you reference -- if you could, I am

 7    going to give you a chance to just link this up, if

 8    you don't mind.

 9            If you look at pages 4 through 6 of your

10    report, you referenced different excerpts from the

11    depositions of the HP people.

12            I would just ask you, sir, if you take a

13    moment, and this might be a good time for a bathroom

14    break anyway.  We have been going at this for an hour.

15            If it's okay with you Josh, you

16    Mr. Hannaford, and you Mr. Kutchek, we can take a five

17    minute break.  And maybe on the front end of that or

18    back end of that, if you wouldn't mind taking a look

19    at pages 4 through 6, and identifying if you reference

20    anywhere in there the deposition testimony that was

21    supportive of this notion that HP was aware that

22    non-approved battery packs were available for sale by

23    third party retailers.

24            Okay?

25        A    Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

43

1            MR. LICATA:  Understood.

2            VIDEOGRAPHER:  We are going off the record.

3      Time indicated is approximately 11:04 a.m.

4            (Recess taken.)

5            VIDEOGRAPHER:  Back on the video record at

6      11:11 a.m.

7      Q     Mr. Kutchek, I gave you an opportunity to

8  take a look at pages 4 through 6 with respect to my

9  question about what is the source or basis for the

10 contention that HP was aware that non-HP approved

11 battery packs were available for sale by third party

12 retailers, which could fit into their HP notebooks.

13     A     Yes.

14           I would refer back to it would be page 5,

15 the third paragraph down.  Then on page 6 --

16     Q     Hang on one second.  Let's put on the

17 record what that is.  Then we will do the next one.

18 Is that all right?

19     A     Yes.

20     Q     Page 5, third paragraph down.  I want to

21 make sure I am in the right spot.  Is it the paragraph

22 that begins "Pipho acknowledged"?

23     A     Yes.

24     Q     I will read for the record what that is, so

25 we have it.  Then I will ask you a question about it.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

44

```
 1    It says, "Pipho acknowledged there are non-HP approved

 2    battery packs which can fit into the notebook.  Yes, I

 3    am aware, page 107.  We design the notebook to

 4    interact, specifically, with HP approved battery

 5    packs, page 107."

 6              So your reference is to page 107 of

 7    Mr. Pipho's deposition.

 8              Correct?

 9       A    Yes.

10       Q    So that is one data point.  Correct?

11            What was the other one?

12       A    Page 6.  The seventh paragraph down.

13       Q    What does it begin with, sir?

14       A    "Wozniak stated the notebook."  The second

15    from the bottom says "section."

16       Q    "Does not notify the user if a non-HP

17    approved battery was installed into the notebook"?

18       A    Correct.

19       Q    So a couple questions about these.  What

20    jumps out at me, the statement I just read -- you know

21    what, I think I shorthanded it.  Let me read it aloud

22    for the stenographer, so he gets it clean and neat.

23              You were referencing, "Wozniak stated that

24    the notebook does not notify the user if a non-HP

25    approved battery was installed into the notebook, page
```

1    52."

2              Is that correct?

3      A    Yes.

4      Q    So let me just ask.  The question I had was

5    what was the basis for your contention that HP was

6    aware that non-HP approved battery packs were

7    available for sale by third party retailers, which

8    could fit into their HP notebooks.

9              Then you referenced, with respect to

10   Mr. Wozniak, a statement where he says the notebook

11   does not notify the user, if a non-HP approved battery

12   was installed into the notebook.

13             What about that supports the notion that HP

14   was aware that retailers sold third party --

15   non-approved third party batteries?

16     A    Well, he was acknowledging there was non-HP

17   approved batteries out there by not saying that they

18   don't exist.

19     Q    I think I got that.

20             With respect to Mr. -- both of these

21   statements, what is your support for the proposition

22   that HP knew this as of 2007, 2008, when the Elitebook

23   was designed?

24     A    I'm not aware of seeing anything about

25   their knowledge in the 2008 period.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

46

```
 1        Q      Anyway, those pages in the deposition will
 2   speak for themselves.  They will say what they say.
 3   Right?
 4        A      Yes.
 5        Q      All right.
 6               With respect to -- if you go to item 4 on
 7   page 16, it says here, "HP was aware of the potential
 8   safety hazard of using non-HP approved battery packs
 9   in their HP notebooks, and warned users against it.
10   Power," meaning Mr. Power, "was exposed to this
11   hazard."
12               Did I read that correctly?
13        A      Yes.
14        Q      And I just clarified in my reading that
15   Power meant Mr. Power, only because I think when you
16   are talking about battery packs and power, it could be
17   confusing.  So I added "Mr. Power."  But we all know
18   what we are referring to.
19               Correct?
20        A      Yes.
21        Q      Same question that I had earlier with item
22   1.  What is -- we will take a minute, let you go back
23   and look at pages 4 through 6.  I assume that is where
24   your basis for this is.
25               Where is your basis for the contention that
```

1   HP was aware of the potential safety hazard of using

2   non-HP approved battery packs in their HP notebooks

3   and warned users against it?

4       A    I will refer back.

5       Q    We can go off the record for a minute.  Or

6   better yet, because we have the videographer and it

7   creates a whole kerfuffle, why don't we all keep quiet

8   for a moment.  Don't talk aloud, Mr. Kutchek.  Just do

9   your looking, and when you are ready, let us know.

10  Okay?

11      A    Yes.

12           Okay.

13      Q    Thank you sir.

14           Why don't you go ahead, I will ask the

15  question, and you can answer it.

16           What is the basis for your contention that

17  HP was aware of the potential safety hazard of using

18  non-HP approved battery backs in their HP notebooks

19  and warned users against it, Power was exposed to this

20  hazard?

21      A    It would be based on statements made in the

22  depositions of the two HP individuals.

23           And the first would be Wozniak.  In my

24  report it is the fourth paragraph down, the first one.

25      Q    Is that "Wozniak stated the battery pack"?

48

```
 1      A     Yes.

 2      Q     Okay.  We will come back to it.  What is

 3   the other one?

 4      A     The next one would be page 6, the top

 5   paragraph.

 6      Q     It begins "Wozniak stated the battery pack

 7   has protections"?

 8      A     Yes.

 9      Q     Anything else, sir?

10      A     Yes.

11      Q     Go ahead.

12      A     It would be page 5, second paragraph down.

13      Q     "Pipho stated battery pack contained

14   warning label."  That one?

15      A     Yes.

16      Q     Any other items, sir?

17      A     I guess that's it.

18      Q     Let's just read them into the record.  I

19   will do them in the order they appear in your report,

20   which is not the order you gave them to me.  And that

21   is fine.  But just so you can follow along.

22            You referenced for support for your

23   position in your findings, No. 4, "HP was aware of the

24   potential safety hazard of using non-HP approved

25   battery packs in their HP notebooks, and warned users
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

49

1    against it.  Power was exposed to this hazard."

2              One you reference the fact that, according

3    to your report, Mr. Pipho stated that the battery pack

4    contained warning label, quote -- warning, quote,

5    "label that states replace with HP spares from page 94

6    of his deposition."

7              Correct?

8      A     Yes.

9      Q     And then the other two items that you

10   believe support your finding No. 4 is -- one is

11   referenced on page 5 of Exhibit 1, Mr. Wozniak's

12   testimony.

13             And I will read what you wrote in your

14   report.  "Wozniak stated that the battery pack has

15   safety protections to prevent the battery pack from

16   overcharging, quote, 'the primary protection IC

17   monitors, the individual cells,'" close quote.

18             Quote, "It monitors the overall use.  And

19   if it exceeds a particular voltage limit, then it

20   shuts off the current, page 26."  Quote, "The primary

21   protection I see also protects against overcharge --

22   overdischarging, short circuit, page 29."

23             Did I read that correctly?

24     A     Yes.

25     Q     And then the third one is at the top of

1    page 6 of Exhibit 1 in your report.  And it reads,

2    "Wozniak stated that the battery pack has protections

3    against excessive temperatures inside the cells, page

4    31."

5              Quote, "Each individual cell has a PTC,

6    which is a positive thermal coefficient device," close

7    quote.  And quote, "It has a CID, which is a current

8    interrupt device," close quote.  Quote, "Which are the

9    two primary factors to help prevent thermal runaway,"

10   close quote, page 32.

11             Open quote, "PTC is designed, if the

12   temperature of the cell exceeds a certain limit, which

13   would be lower than a thermal runaway.  It opens up

14   and prevents more energy from being put into the

15   cell," close quote.

16             And then another quote.  "CID responds to

17   pressure inside the cell.  And as heat can build up,

18   or other conditions within that cell can build up, it

19   opens up, that CID releases that pressure so it

20   doesn't go into thermal runaway," close quote.  Page

21   34.

22             Did I read that correctly?

23       A    Yes.

24       Q    So with respect to the two items that you

25   reference of Mr. Wozniak's testimony, what about those

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

51

1   demonstrates that HP was aware of the potential safety

2   hazards of using non-HP approved packs in their HP

3   notebooks?

4       A    Well, Wozniak goes into detail talking

5   about the safety protections that are built into their

6   battery packs.  So that leads me to believe that HP

7   was aware of the hazards of lithium ion batteries.

8           And so HP went to great lengths to include

9   safety protections in the HP approved battery packs to

10  prevent incidents from thermal runaways from

11  happening.

12      Q    But your statement on page 16 doesn't just

13  indicate that HP is aware of potential safety hazards.

14  It says potential safety hazards of using

15  non-approved -- non-HP approved battery packs.

16          There is nothing in either of those

17  statements by Mr. Wozniak in which he suggests that he

18  is aware that non-approved batteries do not have those

19  safety protections, is there?

20      A    He did not say that.  No.

21      Q    Okay.

22      A    That is what I was saying.

23      Q    So the point of it is, as far as

24  Mr. Wozniak's testimony is concerned, that you just

25  referenced, the only thing supportive of that sentence

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

52

1    of item 4, that you have of your finding really is the

2    fact that there are safety issues with with battery

3    packs that need to be addressed.  That is the Wozniak

4    part.

5              Correct?

6        A    The Wozniak part, yes.  Pipho I think his

7    name is --

8        Q    I said Pipho.  I'm not saying I have it

9    right, sir.  I'm saying that is how I say it.

10             Do you remember how it was pronounced,

11   Josh?

12             MR. LICATA:  I think it was Pipho.

13       A    Pipho made the other statement warning

14   against not using HP approved products.

15       Q    So setting aside -- Mr. Wozniak's testimony

16   to you demonstrates there is safety issues with

17   respect to battery packs.  But you would agree with

18   me, the parts you referenced certainly here today do

19   not demonstrate that Mr. Wozniak was aware of a safety

20   hazard in using non-approved HP battery packs.

21   Correct?

22             You would agree with that?

23       A    In the statements that we identified, no,

24   he is not making the statement about non-HP packs.

25       Q    Are you aware of any statement of

```
 1   Mr. Wozniak, in which he makes that statement?

 2        A    I would have to go through his whole

 3   deposition to verify.

 4        Q    Well, do you make reference in your report

 5   to any statement that you relied upon by Mr. Wozniak

 6   in which he makes that statement?

 7        A    No.

 8        Q    So certainly the only thing that you pulled

 9   from his deposition, the only items you pulled from

10   Mr. Wozniak's deposition and used in your report, you

11   would agree, as you sit here today, that they do not

12   support the notion that he was aware of the safety

13   hazard of using non-HP approved battery packs,

14   correct?

15        A    I would say none of the statements reflect

16   that.

17        Q    Then another one is the Mr. Pipho one, on

18   page 5, where you reference his statement from page 94

19   of his deposition in which he indicates that the

20   battery pack that shipped with the Power notebook

21   contained a warning label that states, "Replace with

22   HP spares."

23             Correct?

24        A    Yes.

25        Q    And that is it?  There is nothing else from
```

1    Mr. Pipho that supports item No. 4.

2            Correct?

3    A    Not that I recall.  I would have to go

4    through his deposition again to be sure.

5    Q    But same point.  There is nothing that

6    you -- in preparing your opinion -- called out to

7    identify to say, hey, this is what I am relying on in

8    connection with my opinion.  The only thing you relied

9    upon, that you disclose in your report, is what you

10   reference on page 5.

11           Right?

12   A    Yes.

13   Q    And that is, specifically, the testimony we

14   just read from page 94 of Mr. Pipho's deposition.

15   Correct?

16   A    Yes.

17   Q    Now, you are aware, are you not, that

18   Mr. Power had a prior duplicate version of this

19   Elitebook.

20           Correct?

21   A    I do recall him saying he had a second

22   unit.  Yes.

23   Q    Actually, it was a first unit.  Right?  In

24   other words, he had it before --

25   A    That's right.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

55

```
 1      Q     I am not trying to be funny.  You said --
 2   what you said was correct.  I want to get the timeline
 3   correct.
 4            Prior to what we have been calling the
 5   Power notebook, which is the artifact one that is the
 6   subject of this lawsuit, Mr. Power owned another
 7   Elitebook 8730W.
 8            Correct?
 9      A     Yes.
10            I do recall that from his deposition.
11      Q     All right.
12            Do you know whether Mr. Power bought that
13   8730W Elitebook new or used?
14      A     I don't recall.  I would have to refer back
15   to the deposition.
16      Q     Would you like to refer back to it?
17      A     I mean, I have the snippets I have in my
18   report.  But I don't have the full deposition here.
19      Q     Do you consider of any significance to your
20   opinions in this case whether Mr. Power bought the
21   prior version -- the prior unit, the 8730 that he
22   owned before the one in this case, do you consider any
23   significance whether he bought it new or used?
24      A     No.
25      Q     Do you know, sir, would you agree with me
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

56

1   if he bought it new, then he would have gotten it with

2   the user manual and things of that nature, that

3   accompany it; correct?

4       A    That's true.

5       Q    And also, if he bought it new, it would

6   have had a battery pack on it that had the warning you

7   just referenced Mr. Pipho identified in his

8   deposition.

9         Correct?

10      A    Yes.  It should.

11      Q    So if Mr. Power had bought a new unit, and

12   reviewed the owner's manual, or the user's manual, and

13   looked at the unit, he would have received the warning

14   that we have talked about here today.  Isn't that

15   true?

16      A    I assume so.  Yes.

17      Q    And you do not know, as you sit here today,

18   whether Mr. Power himself was aware, prior to

19   purchasing the unit that is at issue in this case, of

20   the fact that if you use a non-approved HP battery in

21   your notebook, it could be a safety issue.  You don't

22   know one way or the other whether he knew that, do

23   you?

24      A    I don't recall that coming up in his

25   deposition.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

57

```
 1       Q       And do you understand, sir, the reason why
 2   that didn't come up at his deposition is because at
 3   the time of his deposition, the plaintiff's theory was
 4   not that this was a non-approved battery pack, but
 5   that it was instead a defective HP battery pack.  Do
 6   you understand that?
 7               MR. LICATA:  Object to form.  You can
 8       answer.
 9       A       No.  I don't.
10       Q       If you knew that at the time of his
11   deposition the theory of the case was that the battery
12   pack was a defective HP battery pack, and not that it
13   was a non-approved HP battery pack, would you have
14   wanted to speak to Mr. Power to ascertain more about
15   what he knew or didn't know about the computer before
16   rendering your opinion?
17               MR. LICATA:  Object to form.  You can
18       answer.
19       A       I mean, it's hard to say how my thought
20   process would have changed, based on the timing of his
21   deposition.
22       Q       Well, I guess my question is, you rendered
23   an opinion here in which you indicate that an
24   authentication warning was not given to Mr. Power.
25   Right?  That is part of what your opinion states.
```

58

1    Correct?

2        A    Yes.

3        Q    And the question I have asked you is, do

4    you know if Mr. Power even needed that warning?  And

5    you can't answer that.  Can you?

6        A    Well, you give warnings to users to remind

7    them.  So even if they read it five years prior

8    doesn't mean they remember it.  So the purpose of pop

9    up warnings is to remind you there for whatever the

10   purpose of the warning is.

11       Q    Okay.

12            But as you sit here today, sir, you don't

13   know if Mr. Power got that warning five years ago --

14   five years before, do you?

15       A    No.  I don't.

16       Q    You don't know if he had that in his head

17   as of the day he was using that computer or not.  Do

18   you?

19       A    No.

20       Q    Because the reality of it is, the only

21   thing you relied upon to determine what Mr. Power did

22   or did not know, or what Mr. Power did or did not

23   think, or what Mr. Power was or was not warned of, was

24   his deposition that took place on July 30th, 2018.

25   Correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

59

```
 1      A     Yes.
 2      Q     And are you aware, sir, of whether or not
 3   Mr. Power's negligence is at issue in this case?
 4      A     Could you repeat that?
 5      Q     Are you aware that in this case there is a
 6   question of whether Mr. Power was himself negligent?
 7      A     No.  I am not.
 8      Q     Okay.
 9            Do you have any -- strike that.
10            If Mr. Power received the warning that we
11   are talking about five years before, and either failed
12   to heed it, or failed to remember it, doesn't that
13   indicate that he himself bears some responsibility for
14   this incident?
15            MR. LICATA:  Object to form.  You can
16      answer.
17      A     I guess I don't know what he would be
18   responsible for, if he got a warning five years prior.
19      Q     Well, did you ask him, sir, or do you know
20   whether he retained the documents from the original
21   notebook?
22      A     No.  I never talked to him.
23      Q     Do you know whether Mr. Power went online
24   and looked at -- let me back up.
25            You don't know, do you, that when he bought
```

```
 1   the original -- his first Elitebook 8730, you don't

 2   know whether he went and looked at the user's manual

 3   online, do you?

 4       A    No.  I don't.

 5       Q    Do you think that that would be important

 6   to know in connection with your opinion in this case?

 7       A    I guess do we know the answer to the

 8   question of did he buy it new or not?  Do we know that

 9   answer?

10       Q    I don't know.  You work for him.  Did you

11   ask him?

12       A    Well, was it in his deposition?

13       Q    How about you answer my question.  You work

14   for him.  Did you ask him?

15       A    I never talked to him.

16       Q    So you didn't ask him that question.

17   Right?

18       A    No.

19       Q    At the -- I will represent to you, sir, at

20   the time of his deposition, we were under the

21   impression that the theory in this case was not that

22   plaintiff was saying there was an aftermarket or

23   unapproved battery pack in the notebook.  The theory

24   of the case that was espoused over and over was it was

25   a defective HP product.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

61

```
 1              Do you understand that?
 2      A     I don't know what the theory of the case
 3   was during his deposition.
 4      Q     So let me back up now.
 5              I asked this question.  Would it be of
 6   import to you to know whether or not Mr. Power ever
 7   went online before this incident and looked at the
 8   user's manual for this product before this incident?
 9   Would that be of import to you?
10      A     Yes.  I would want to know.
11      Q     Why would you want to know that?
12      A     I would like to determine what warnings he
13   may or may not have received.
14      Q     As you sit here today, you don't know, do
15   you?
16      A     No.
17      Q     Because unless it was asked at his
18   deposition, you weren't going to make any further
19   inquiry about it.
20              Right?
21      A     I don't know.
22      Q     Well, you didn't make any further inquiry
23   about it, did you?
24      A     No.  I didn't.
25      Q     So you looked at thousands of pages of HP
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

62

1    documents.  You read two HP deposition transcripts.

2    You went and researched things on the patent -- from

3    the patent office.  But you never picked up the phone

4    and called your client to say, "Hey, what did you

5    know, and when did you know it?"

6          A    I already told you I didn't talk to him.

7          Q    All right.

8               Do you know, sir, who Mr. Power bought the

9    Power notebook, or we are talking about as the

10   artifact notebook from, do you know who he bought it

11   from?

12         A    My understanding is he bought it on eBay.

13         Q    Are you aware Mr. Power has a receipt or a

14   credit card transaction that indicates from whom he

15   bought it?

16         A    I vaguely remember there being some

17   purchasing records from eBay.

18         Q    Did you review those records?

19         A    Yes.

20         Q    I don't believe you reference reviewing

21   those records in your report.

22              Do you?

23         A    It would have been included in the list of

24   materials reviewed.

25         Q    All right.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

63

```
 1              If you could just take a look at your
 2   available information, which I understand that is a
 3   list of materials reviewed.
 4              Is that fair?
 5      A     Yes.
 6      Q     Can you identify for me where in that list
 7   of materials reviewed is the eBay purchase
 8   information?
 9      A     I don't see it listed.  I think it may have
10   been discussed in his deposition.
11      Q     All right.
12              Did you make any effort to contact the
13   seller?
14      A     No.  I didn't.
15      Q     Do you know how much Mr. Power paid for the
16   computer he bought off of eBay?
17      A     I don't recall the exact number.  But it
18   was a couple hundred dollars.
19      Q     Would you be -- are you aware that he
20   initially bought it for one price, then he got a
21   discount of 100 bucks afterwards?
22      A     I do recall something of the fact at his
23   deposition.
24      Q     Do you know when he bought it?
25      A     I don't recall.
```

64

```
1        Q     Is it fair to say, sir, that because you
2   never talked to the eBay seller, that you don't know
3   what the eBay seller did to this notebook computer
4   prior to selling it to Mr. Power.  Correct?
5        A     Correct.
6        Q     Do you know if the seller installed any
7   software?
8        A     I don't know.
9        Q     Do you know if the seller uninstalled any
10  software?
11       A     I don't know.
12       Q     Do you know if the seller had any computer
13  expertise?
14       A     I don't have any information about the
15  seller and the laptop prior to Mr. Power's --
16       Q     So it's fair to say you don't know, aside
17  from the battery pack, do you know if the seller did
18  anything else to the hardware?
19       A     No.  I don't.
20       Q     Did you make any effort to determine what
21  aspects of the Power notebook were original to the
22  notebook and what were not?
23       A     I think it was determined that, again, I
24  think it came out of one of the HP reps saying that
25  they believe the battery pack was to be a non-HP
```

NETWORK DEPOSITION SERVICES
Transcript of Kenneth J. Kutchek, P.E.

65

1    approved pack, but they did believe the charger was an

2    HP product, HP approved product.

3         Q    Do you know if the HP -- the charger, the

4    AC adapter, can we use those terms synonymously?

5         A    Yes.

6         Q    I like AC adapter.  Do we know if the AC

7    adapter was original to this notebook?  Or just an HP

8    product?

9         A    I don't think we know if it is original or

10   not.

11        Q    So setting aside the battery pack and the

12   AC adapter, did you do anything to determine if any

13   other aspects of the notebook computer were original

14   to the computer?

15        A    No.  I didn't.

16        Q    Did you do anything -- I am not trying to

17   be difficult here, but I have to put things on the

18   record.  I know you said you never talked to the

19   seller.  Is it fair to say that you do not know

20   whether or not the seller physically abused this

21   notebook before it was sold, do you?

22        A    I don't know what they did to the notebook.

23        Q    Do you know if the prior seller did

24   anything to the safety features of this notebook

25   before selling it?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

66

```
 1      A     No.  I don't.

 2      Q     You don't know what caused this battery

 3  pack to go into thermal runaway, do you?

 4      A     No.  I don't.

 5      Q     So as you sit here today, you do not know

 6  whether the battery pack went into thermal runaway

 7  because it was a non-approved HP battery pack, or for

 8  some other reason related to the actions taken by the

 9  seller, isn't that true?

10      A     I don't know what actions you are referring

11  to by the seller that would have caused a thermal

12  runaway some time later.

13      Q     But you don't know, because you never

14  investigated whether the notebook itself was in

15  substantially similar condition as it was when it left

16  HP's hands.

17            Correct?

18      A     Say that again.

19      Q     Mr. Hannaford, can you please read that

20  back?

21            (Record read.)

22      A     I inspected the laptop after it was heavily

23  fired -- heat damaged, so it is difficult to say the

24  condition it was in prior to the incident.

25      Q     Well, you never took it apart, did you?
```

```
 1      A     I did not.

 2      Q     So you never disassembled it and compared

 3   it to a disassembled exemplar to determine if it looks

 4   the same.

 5            Correct?

 6      A     No.  I thought we may do that as a joint

 7   inspection.  But we never did.  I would never touch

 8   evidence like that without other parties being there.

 9      Q     Did you ever proffer a protocol for such a

10   joint inspection?

11      A     No.  I didn't.  I don't recall anything in

12   HP depositions that said anything about, specifically,

13   that after the CT scan whether any components within

14   the laptop were not HP components.

15      Q     Do you know if any of those HP people even

16   ever looked at those CT scans, sir?

17      A     No.  I don't.

18      Q     Okay.

19            Have you ever obtained a patent?

20      A     No.  I haven't.

21      Q     Have you ever filed for one?

22      A     No.  I haven't.

23      Q     Do you have any legal training in patent

24   law?

25      A     No.  I don't.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

1       Q       Do you know what the typical time between

2    filing of a patent and when a patent is issued is?

3       A       No.   I don't.

4       Q       Do you know what different types of patents

5    there are?

6       A       I don't recall.

7       Q       Is it you don't recall -- did you ever

8    know, or do you just not recall today?

9       A       I am aware there are different type

10   patents.   But I don't recall what they are today.

11      Q       Does the fact that a patent is either

12   applied for or issued mean that the technology

13   referenced in the patent is going to come to market?

14      A       No.   It doesn't.

15      Q       In fact, there is a zillion patents that

16   have been issued by the patent office that have never

17   seen the light of day.   Isn't that true?

18      A       I don't know about your quantification of a

19   zillion.   But there may be some, yes.

20      Q       Kudos to you, sir, because that was a

21   freebie for you.   I wanted to see if you would nail me

22   on the zillion part, because I was having a little fun

23   there.

24              In seriousness, you would agree that there

25   are multitudes of patents that have been issued by the

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

69

1   patent office, that have never gone to market.  True?

2       A    Yes.

3       Q    And the reason for that, at least one

4   reason, is that there is an incentive to file for

5   patents to protect your intellectual property.

6            In other words, if you come up with an idea

7   or an invention, you want to file the patent as soon

8   as you can reasonably do it, so you get your

9   intellectual property protected.  And then you figure

10  out, basically, whether you can bring it to market in

11  a manner that is successful and will make you money,

12  and things of that nature.

13           Isn't that true?

14      A    Yes.

15           I agree that filing a patent is for

16  intellectual property reasons.

17      Q    But my point is, there is incentive to do

18  it sooner than later, because you get protection of

19  your intellectual property upon filing, but you don't

20  necessarily -- you don't get protection, if you don't

21  file, right?  Somebody could steal your invention,

22  basically, right?

23      A    Correct.

24      Q    You reference -- why don't you tell me, you

25  reference some patents beginning on page 14 over to

```
 1    15, you reference some patents that you contend

 2    pertain to component part authentication, or I guess

 3    your word, if you are not happy with that word,

 4    replaceable component authentication.  Is that

 5    correct?

 6         A    Yes.

 7         Q    Can you just tell me for the record what

 8    you did to identify these patents as being applicable?

 9         A    I searched numerous patents regarding

10    laptop batteries and authentication of components,

11    inkjet cartridges, and telephones.  I was just

12    searching on authentication of components in

13    electronic products.

14         Q    All right.

15              Maybe your question is more thoughtful --

16    or answer is more thoughtful than my question.

17              What did you do?  I think earlier you said

18    you went to Google.  Right?  Is that what you did?

19    What did you Google?

20         A    I would Google all of -- any and all of

21    those words.  It took multiple searches to find these.

22    It was Googling words like "authentication" and

23    "electronic power products."  "Authentication of

24    components."  So it was numerous searches to identify

25    various patents.
```

```
 1       Q      Did you do anything, sir, to determine

 2   whether any of these patents actually went to market?

 3       A      No.  I didn't.  I mean, it doesn't matter

 4   if they went to market.  It is saying the technology

 5   was out there, and people were aware of it.  When

 6   someone files for a patent, that means it is public

 7   knowledge at that point.

 8       Q      All right.

 9              So with respect to my question, you didn't

10   do anything to determine whether or not these patents

11   actually made it to the marketplace.

12              Correct?

13       A      Correct.

14       Q      All right.

15              You are not suggesting in your testimony

16   that someone could copy what is in those patents.

17   Correct?

18       A      You know, a patent -- no.  Short answer is

19   no.  But the idea of a topic is presented.  And the

20   method that one manufacturer uses to accompish

21   something may be different than what another

22   manufacturer uses.

23              But for example, authentication could be

24   done in different ways.  So it was just saying that

25   the ability to do authentication was known at that
```

```
 1    time those patents were issued.

 2         Q     Right.

 3               But what I am saying to you is that -- I

 4    think you agree, I want to just get to my question, if

 5    you don't mind.  You agree that one could not go to

 6    the patent office, take the patent application, and

 7    copy that and do the authentication.  You agree with

 8    that statement.

 9               Correct?

10         A     Correct.

11         Q     And you reference manufacturing.  I want to

12    be clear about this.  Because I think you were saying

13    it generically.  But I want to make sure.

14               It is not just about manufacturing.  One

15    cannot copy the design that is set forth in the

16    patent, because you would be violating the

17    intellectual property rights of the patent holder.

18    Isn't that true?

19         A     Yes.  I was using the word "manufacturer"

20    generically.  And I was referring to design and

21    manufacturing.

22         Q     So one cannot copy the design or

23    manufacturing -- to the extent the manufacturing is

24    unique to the patent, one cannot copy that either.

25    Correct?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

73

1      A      Not specifically as detailed in the patent.
2    Correct.
3      Q      Well, you are not an expert in patent law.
4    So you say "not specifically."  What do you think --
5    why don't you state for the record what you think one
6    can copy from a patent?
7      A      If one entity files a patent for a product,
8    they may be implementing that technique in a very
9    specific way.  If another manufacturer wants to use a
10   similar idea, but implement it in a different way,
11   they are able to do that, as long as they don't
12   infringe that first patent.
13     Q      You have no expertise whatsoever in battery
14   pack or battery cell design.
15            Correct?
16     A      Correct.
17     Q      And you have no expertise whatsoever with
18   respect to computer notebook design or manufacturing,
19   correct?
20     A      Correct.
21     Q      And so you yourself, as you sit here today,
22   have no way of knowing what could or could not be used
23   from any of the patents that you are talking about in
24   your report by another party.
25            Correct?

NETWORK DEPOSITION SERVICES
Transcript of Kenneth J. Kutchek, P.E.

74

1          A      No.  I mean, I am an engineer.  I can see

2     what the patent says.  I understand what the patent

3     says.  I can see how a manufacturer would implement

4     that patent based on the words they use in their

5     patent and their drawings and designs.  And then see

6     how another manufacturer may do something similar but

7     not infringe that patent.

8          Q      Okay.

9                 Did you, in this case, undertake in your 20

10    to 30 hours worth of work to ascertain whether or not

11    HP could use anything from any of these patents that

12    are not its own in connection with its notebook

13    computers?  Did you do that work, sir?

14         A      It was just my analysis of the patents,

15    yes.

16         Q      So now state for the record, specifically,

17    what HP could have used from those patents?  Design,

18    sir.  The design work.  Please.  Mr. Engineer.

19         A      Are you done?

20         Q      Go.

21         A      I would have to go through each one one at

22    a time.

23         Q      Well, you don't reference any of that in

24    your report.  Do you?

25         A      My point in my report was that the

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

75

1    technology was known and available at the time.

2         Q    Well, it wasn't available.  Because you

3    can't use someone else's patented work, sir.

4              Right?

5         A    We already talked about that.  You can't

6    copy an exact patent.  But you can do things that are

7    similar and not infringe upon the patent.

8         Q    You do not know, you have no idea, sir,

9    where the line is with respect to computer design or

10   battery pack design where someone could, quote,

11   unquote, "use some of it, but not use all of it."  Do

12   you?

13        A    What is your question?

14        Q    That is my question.

15             Isn't it true, the reason why -- the

16   reference you make to these patents, the only reason

17   you reference these patents is to demonstrate that the

18   notion of authentication was out there.

19             It is not to suggest that anyone could

20   reverse engineer authentication from these patents,

21   sir.  And you don't have any legal ability or

22   knowledge to suggest that.

23             Do you?

24        A    I never mentioned anything about reverse

25   engineering these patents.  So you are putting words

```
 1   in my mouth there.  And so --
 2        Q    That is what you are saying.  That is.
 3             MR. LICATA:  Would you let the witness
 4        answer, please?
 5        Q    I am sorry.  Go ahead.  I apologize.
 6        A    Let's go back.
 7             What is your question?
 8        Q    Okay.
 9             Mr. Hannaford, would you read back my
10   question before I interrupted the witness?
11             And I apologize again.
12             (Record read.)
13        Q    I strike the question.
14             Certainly -- I think you agree with me you
15   are not suggesting someone can reverse engineer these
16   patents.
17             Correct?
18        A    No.
19        Q    No, you are not?
20        A    No, I am not.
21        Q    Okay.
22             Is it correct that your reference to these
23   patents is to demonstrate that the notion of
24   authentication was out there?
25        A    Yes.  My point is the technology was
```

1     available at the time.

2         Q     Well, it was certainly, in your estimation,

3     available to the four patent holders indicated.

4     Correct?

5         A     I don't recall the number I referenced in

6     my report.  But yes, those are ones -- those are some

7     of the ones that are available, and I chose to put in

8     the report.

9         Q     And with respect to you say at the time --

10    and that is a good question.  When is the time?  What

11    is the time frame?

12              Because you would agree with me that with

13    respect to the BlackBerry patent, that was applied for

14    and granted long after the manufacture, years after

15    the manufacture of the Power notebook.

16              Correct?

17        A     The BlackBerry one was in 2011.  Yes.  But

18    the others I mentioned are -- the HP one I mentioned

19    is in 2008.

20        Q     I will get to them.  Don't worry.  I will

21    get to them.

22              So the BlackBerry one is not at the time.

23    Correct?

24        A     Correct.  It was after.

25        Q     And the same is, actually, true for the

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

78

```
 1    Panasonic one, the battery authentication.

 2            Correct?

 3       A    It was applied in September 2009.  That

 4    would be --

 5       Q    Go ahead.

 6       A    That time frame is close to the time of

 7    manufacturing.

 8       Q    But it is after.  Isn't it?  That is just a

 9    matter of just looking at a calendar.  If you look at

10    Bates stamp 2466, it says in it, which is part of the

11    documents you reviewed, the manufacturing date of the

12    Power notebook was August 18, 2009.

13            So that Panasonic one is, again, after the

14    manufacture.  And as you indicated, probably a year or

15    two after the design of the notebook.

16            Correct?

17       A    Yes.  It is.

18       Q    And then there are two others you refer to.

19    There is a HP patent with respect to inkjet printer

20    cartridges authentication.

21            And that was applied for in 2008, which is

22    before the manufacture of the Power notebook.  But you

23    don't know whether it was before the design of the

24    notebook.

25            Fair?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

```
 1      A     It was in the time frame that I would
 2   expect the design to have been taking place.
 3      Q     That patent wasn't even granted until after
 4   the manufacture.
 5            Correct?
 6      A     Correct.
 7      Q     Do you know the purpose of the
 8   authentication patent that HP applied for?
 9      A     No.  I don't know their intent when they
10   applied for the application.
11      Q     In other words, do you know whether it was
12   applied for as a safety issue, or was it applied for
13   because they wanted to sell more inkjet printer
14   cartridges?
15      A     I don't know.
16      Q     And did you do anything to try to find out?
17      A     I read the patent.  I don't recall if that
18   was mentioned in there or not.
19      Q     And then the final patent you reference is
20   the Lexmark International patent related to ink
21   cartridge authentication and inkjet printers.  And one
22   was applied for in 2005.
23            And it looks like it was issued in
24   September of 2005.  And then another one was applied
25   for in 2005 that was issued in September of 2009.
```

 1    Correct?

 2        A     Yes.

 3        Q     So at least with respect to those two

 4    patents, they appear to have been applied for before

 5    the manufacturing date.  One of them was issued before

 6    the manufacturing date of the Power notebook, and then

 7    the other one was issued after the manufacture date.

 8    Correct?

 9        A     Yes.

10        Q     So of the patents you reference in your

11    report as evidence that authentication technology was,

12    quote, "available at the time," the only ones that

13    were applied for before the manufacturing date of the

14    Power notebook were ones pertaining to inkjet printer

15    cartridges.

16              Correct?

17        A     Yes.

18        Q     Do you know whether inkjet printer

19    cartridges are -- I'm trying to think of a way to say

20    this.

21              Whether they are made and sold by the same

22    manufacturer, meaning in connection with HP, for

23    example the HP printer, do you have an understanding

24    of whether or not the printer cartridges that HP was

25    selling were all under HP's house -- all under HP's

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

81

1    umbrella?

2        A     I am not familiar with their inkjet printer

3    cartridge manufacturing.

4        Q     Do you believe -- do you know -- let me put

5    it this way.

6              Did you do anything to determine whether

7    the technology that is described in the patents for

8    the HP printer and for the Lexmark -- printer

9    cartridge and the Lexmark printer cartridge, did you

10   do anything to determine whether that technology could

11   be incorporated into notebook computers?

12       A     No.  I did not do any additional work.  I

13   mean, as an engineer, I would see that the technology

14   can be used in various industries.

15       Q     Did you look at any -- fair to say that

16   the -- strike that.

17             That is something you could have tested.

18   Right?

19       A     What could I have tested?

20       Q     In other words, one could test, if one

21   wanted to, the prospect of whether the technology from

22   the HP printer cartridge patent, or from the Lexmark

23   printer cartridge patent, could be used for

24   authentication purposes in a notebook computer?

25       A     Well, it is an electronic component.  I

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

82

1    mean as an electronic component, that is what these

2    patents are about is that you can authenticate

3    components used in a product.

4         Q      Right.

5               But I am saying to you, there is specific

6    technology referenced in both of these patents.  And I

7    am just asking you, one could, I am not saying you

8    did, but one could test whether or not the technology

9    in those patents in the HP printer cartridge and the

10   Lexmark printer cartridge patent, whether that could

11   be implemented in a notebook computer.

12              Correct?

13        A      Yes.  One could do that.

14        Q      But you did not do that.

15              Correct?

16        A      No.

17        Q      No, you did not?

18        A      No, I did not.

19        Q      Now, with respect to authentication, did

20   you undertake to determine whether any notebook

21   computers in the marketplace in 2009 used battery

22   authentication?

23        A      I attempted to, but it is difficult to find

24   information on products from ten years ago, 12 years

25   ago.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

83

1      Q      So is it fair to say you tried to determine

2  whether it was in the marketplace, but you couldn't do

3  so.

4             Is that correct?

5      A      Correct.

6      Q      And are you aware, sir, of whether there

7  were any standards regarding battery pack design, that

8  were in place in 2008 and 2009?

9      A      There is an IEEE standard for laptop

10  battery packs.

11      Q      Had you read that prior to seeing my

12  experts' reports?

13      A      I was aware of it, yes.

14      Q      I asked if you read it.  Had you read it

15  before you saw my experts' reports?

16      A      Yes.

17      Q      You certainly did not consider the IEEE

18  standard as important or necessary to your opinions,

19  because you don't reference it in your report.  Is

20  that fair?

21      A      I wouldn't qualify it as saying it was

22  unimportant.  I just failed to refer to that IEEE

23  standard in my report.

24      Q      And you don't rely upon that report -- that

25  IEEE standard in your report, isn't that true?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

84

```
 1        A      I did not.

 2        Q      Now are you -- did you do anything, sir, to

 3   determine whether or not knockoff batteries, or the

 4   safety issues pertaining to, quote, unquote, "knockoff

 5   batteries" was considered -- strike that.  That is not

 6   going to make sense.

 7               Are you aware, even as you sit here today,

 8   whether or not authentication protocols or

 9   authentication software are defeated by unscrupulous

10   sellers of things like batteries?

11        A      Some authentication can be defeated,

12   depending on how it is implemented, and how

13   sophisticated it is.

14        Q      Well, let's talk about with respect to

15   notebook computers.

16               How does the authentication system work in

17   notebook computers?

18        A      There is different ways to do it.

19        Q      Why don't you tell me about those.

20        A      I mean, there is different ways a

21   manufacturer can do it.  I don't know all of the

22   possible ways to implement authentication.

23               I mean, in the HP depositions, they

24   referred to two means that were used in this

25   particular laptop.  And that was the way the battery
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

85

1    connects and interfaces mechanically.  And also the

2    three pin -- three conductor electrical connection to

3    the battery pack.  So that is one means of

4    compatibility.  But authentication would be something

5    more extensive than that.

6         Q    Okay.

7              So how would authentication work?

8         A    I mean, the product, the laptop would have

9    to somehow be able to validate the component that is

10   being installed.

11             And so that could be done with some

12   electronic means or some componentry within the

13   product to allow for a validation that it is an

14   authentic product.

15        Q    So isn't it true, sir, that these types of

16   authentication protocols are now routinely defeated by

17   hackers?

18        A    I don't know about routinely.  But they can

19   be defeated at times.

20        Q    Would you be surprised to learn that every

21   single one of the patented items you referenced in

22   your report has knockoff versions of it being sold

23   presently?

24        A    I'm not aware of that.

25        Q    Did you do anything to ascertain whether

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

86

```
 1    the patented items that you reference in your report

 2    worked?

 3        A      I don't know what you mean by worked.

 4        Q      How about that they prevented people from

 5    using unauthentic components; how about that for

 6    worked?

 7        A      No.  I'm not aware of that.

 8        Q      You don't know one way or the other as you

 9    sit here today.

10               Is that fair?

11        A      Correct.

12        Q      We are at 12:15.  I don't have much more,

13    Josh.  If we could take maybe a five to ten minute

14    break.  Let me look at my notes.  It might save us

15    time.

16               Is that okay with you, Mr. Kutchek, rather

17    than taking a break?  I think we can be done

18    relatively soon, if I make sure I got everything.

19    Okay?

20        A      Yes.

21               MR. LICATA:  Fine with with me.

22               MR. BETKE:  Let's take a five to ten minute

23        break.  I may come back a little sooner.  If I

24        do, and you are here, great.  If not, that's

25        okay, too.
```

```
 1              VIDEOGRAPHER:  We are off the record.  Time
 2      is approximately 12:16 p.m.
 3              (Recess taken.)
 4              VIDEOGRAPHER:  We are back on the video
 5      record.  Time indicated is 12:27.
 6      Q       Back on the record.
 7              The issue of whether or not any of the
 8      patents that you referred to in your report, whether
 9      they have been defeated by hackers, that is something
10      you could check, isn't it?
11      A       I'm not aware of what specific products
12      those patents are actively being used in to be able to
13      check that.
14      Q       Well, I mean, one thing you could do is you
15      could get an exemplar of these products, and then just
16      go on and see if you can go online and buy a
17      non-approved product and use it?
18      A       Again, I don't know what products are
19      actively using the patents that are listed.
20      Q       So the point is you never checked that?
21      A       I did not.
22      Q       Okay.
23              And then with respect to we were talking
24      earlier about patents and what they show.  I indicated
25      that I was asking whether HP could or could not
```

```
 1    duplicate it.  But hackers operate under no such bar.

 2    Right?

 3            In other words, while intellectual

 4    property -- while patents protect intellectual

 5    property, they also provide the opportunity for

 6    unscrupulous people to look at the patent and reverse

 7    engineer things.

 8            Don't they?

 9        A    It is possible.  Yes.

10        Q    Are you aware, sir, in the industry, and I

11    am really speaking, specifically, about consumer

12    electronic products, whether there is a timeline, a

13    known timeline between when a particular product goes

14    to market with authentication technology and how long

15    it takes hackers to defeat it?

16        A    I guess I missed the question part.

17        Q    I am saying are you aware of the timeline

18    that is known in the industry between when

19    authentication technology is put into service, and how

20    long it takes hackers to defeat it?

21        A    No.  I'm not aware how quickly hackers

22    attempt to defeat authentication.

23        Q    All right.

24            And you would agree that if a hacker --

25    strike that.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

89

 1              Are you aware of commercially available

 2    devices that permit unscrupulous people like hackers

 3    to, quote, unquote, "listen in" on the authentication

 4    communications in a notebook and a battery pack, in

 5    order to duplicate it?

 6        A    Am I specifically aware of this?  Is that

 7    the question?

 8        Q    Yes.

 9        A    Not specifically aware.  No.

10        Q    Are you generally aware of it?

11        A    I am aware that that is a technique that

12    can be used.  Yes.

13        Q    Have you ever heard of a device called the

14    Beagle?

15        A    No.  I haven't.

16        Q    Have you ever heard of a company called

17    Saleae, S-A-L-E-A-E?

18        A    No.  I haven't.

19        Q    Which is a logic analyzer.

20        A    No.  I am not specifically aware of that

21    product.

22        Q    Do you know what a logic analyzer is?

23        A    Yes.

24        Q    What is it?

25        A    It's a device that is used to analyze

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

90

1    communication between devices.  And can be used for

2    quality control or reverse engineering.

3         Q     Do you know, did you ever analyze the logic

4    of the power notebook to see if it had been tampered

5    with or changed?

6         A     No.  It was not functional.

7         Q     It you attempt to -- did you attempt to use

8    it?  In other words, did you attempt to power it up?

9         A     No.  I didn't.

10        Q     Do you agree, sir, there exists technology

11   that permits hackers to defeat authentication?

12        A     Yes.  There are some products that assist

13   in defeating software authentication.

14        Q     All right.  I have no further questions,

15   sir.

16                       EXAMINATION

17   BY MR. LICATA:

18        Q     Mr. Kutchek, I just have a couple.  You

19   were asked whether you knew whether Mr. Power bought

20   the at-issue laptop new or used.  Do you remember

21   that?

22        A     I think he was asking about the first

23   laptop.  The one he had prior to this one.

24        Q     Okay.

25              Do you know -- do you know how about -- the

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

91

1    at-issue laptop, do you know whether that was new or

2    used when he purchased it?

3        A      My understanding is the subject laptop was

4    purchased used on eBay.

5        Q      Okay.

6               You were also asked whether you did

7    anything to determine whether the laptop -- the

8    at-issue laptop was in substantially changed condition

9    from when it was initially purchased and when

10   Mr. Power purchased it, or some variation of that line

11   of questioning.

12              I just want to refer your attention to page

13   6 of your report, the second paragraph up from the

14   bottom.  It starts -- I guess they all start with

15   "Wozniak."

16              But it is the second one up from the

17   bottom.

18       A      Okay.  I am there.

19       Q      It says, "Wozniak stated that the notebook

20   charging circuit is not easily replaced.  Quote, 'I am

21   sure there is no pin for pin replacement,' end quote.

22   Quote, 'And these are tiny micron distances,' unquote.

23   Quote, 'Not something you can do without magnification

24   and a very steady hand,' end quote.  Page 62."

25              Did I read that correctly?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

92

```
1       A     Yes.

2       Q     What was the significance of including that

3  section in your report?

4       A     Wozniak is an engineer.  It leads me to

5  believe that he is saying it's not easily changeable

6  is what he is saying in this paragraph, that the

7  charging circuit is not easily replaced.  It is very

8  small componentry.  The average person just could not

9  do something like that.

10      Q     And what is the point of the charging

11  circuitry?

12      A     The charging circuit is what is sending

13  power to the battery pack, so it is involved in

14  charging the battery pack, and so it's an important

15  component.  The battery pack itself has safety

16  protections, but there should be safety protections

17  built into the charge circuit.

18      Q     I think we already went through this.  But

19  you are not suggesting that Hewlett-Packard, back when

20  this at-issue device was manufactured, that they

21  should have copied various patents that you list in

22  your report.  You are not suggesting that, right?

23      A     No.  I am not saying anyone should copy a

24  patent.

25      Q     You are not suggesting they should reverse
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

93

1    engineer any of these patents that you were listing in

2    your report?

3        A    No.  I am not.

4        Q    The reason why you are listing these things

5    in your report is just to show that the information

6    and knowledge was available at the time that this

7    machine was manufactured?

8        A    That's correct.

9        Q    You are not -- your expert opinions today

10    are not what caused the explosion in this case?

11        A    That's correct.  I did not --

12        Q    You are not doing any type of fire origin

13    expert opinion?  You are not offering any fire origin

14    opinion?

15        A    That's correct.

16        Q    Your sole opinion is that with --

17    essentially, I know you have your nine summary kind of

18    breakdowns of your opinion, but your opinion in this

19    case is that the technology existed to warn a user

20    like Mr. Power, through a pop up window, that a non-HP

21    approved battery pack being used posed a potential

22    risk of harm.

23            Is that your opinion?

24            MR. BETKE:  Objection to form.

25        A    Yes.  That summarizes a few of the

1    findings, yes.

2         Q    That is all the questions I have.  Thank

3    you, Mr. Kutchek.

4                      EXAMINATION

5    BY MR. BETKE:

6         Q    I have one to two to follow up on.

7              Mr. Licata asked you about the patents and

8    the purpose that you reference them in your report.  I

9    think it was a bit unintentionally imprecise.  I want

10   to go back to that.

11             He indicated it was available, quote,

12   unquote, "at the time."  But we went through the

13   timeline.  I think you agreed, and I want to make sure

14   we are clear, that of the four patents you reference

15   in your report, the only two patents that were applied

16   for prior to the manufacture of the Power notebook

17   were the two related to printers.

18             Correct?

19        A    Yes.

20        Q    So you weren't trying to change the

21   timeline when you answered Mr. Licata's question.

22   Correct?

23        A    That's correct.

24        Q    I think that is all I have, actually.

25             MR. LICATA:  I think Ken already indicated

**NETWORK DEPOSITION SERVICES**
**Transcript of Kenneth J. Kutchek, P.E.**

95

1       he would read.

2               MR. BETKE:  Then we are done.

3               VIDEOGRAPHER:  With there being no further

4       questions, our deposition is concluded.  The time

5       is approximately 12:39 p.m.

6               THE COURT REPORTER:  Are you ordering

7       transcripts?

8               MR. BETKE:  Yes.  Please also send it to

9       docket@Coughlin Betke.com.

10              MR. LICATA:  Yes.

11              (Thereupon, at 12:41 p.m. the deposition

12      was concluded.)

13                      _ _ _

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       ERRATA SHEET

 2        I, Kenneth Kutchek, P.E., have read the foregoing
      95 pages of my deposition given on January 4, 2022,
 3    and wish to make the following, if any amendments,
      additions, deletions or corrections:
 4
      Page/Line          Should Read          Reason for Change
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18        In all other respects, the transcript is true and
      correct.
19
                         _____
20                       Kenneth Kutchek, P.E.

21    Subscribed and sworn to before me this _____ day of

22    _____, 2022.

23
      _____
24    Notary Public

25                       _ _ _
```

```
 1                    CERTIFICATE

 2   COMMONWEALTH OF PENNSYLVANIA, )
                                   )  SS:
 3   COUNTY OF ALLEGHENY.          )

 4        I, Lance E. Hannaford, do hereby certify that
     before me, a Notary Public in and for the Commonwealth
 5   aforesaid, personally appeared KENNETH KUTCHEK, P.E.,
     who then was by me first duly cautioned and sworn to
 6   testify the truth, the whole truth, and nothing but
     the truth in the taking of his oral deposition in the
 7   cause aforesaid; that the testimony then given by him
     as above set forth was by me reduced to stenotypy in
 8   the presence of said witness, and afterwards
     transcribed by means of computer-aided transcription.
 9
          I do further certify that this deposition was
10   taken at the time and place in the foregoing caption
     specified, and was completed without adjournment.
11
          I do further certify that I am not a relative,
12   counsel or attorney of either party, or otherwise
     interested in the event of this action.
13
          IN WITNESS WHEREOF, I have hereunto set my hand
14   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this 13th day of JANUARY, 2022.
15

16

17        _____
          Lance E. Hannaford, Notary Public
18        My commission expires October 19, 2022

19                        - - -

20

21

22

23

24

25
```

```
 1              NETWORK DEPOSITION SERVICES
                     The Gulf Tower
 2              707 Grant Street, Suite 1101
              Pittsburgh, Pennsylvania  15219
 3                   412-281-7908

 4    January 13, 2022

 5    TO:  Josh Licata, Esquire
           Friday & Cox:
 6         1405 McFarland Road
           Pittsburgh, Pennsylvania  15216
 7
           RE:  DEPOSITION OF KENNETH KUTCHEK, P.E.
 8
             NOTICE OF NON-WAIVER OF SIGNATURE
 9
           Please have the deponent read his deposition
10    transcript.  All corrections are to be noted on the
      preceding Errata Sheet.
11
           Upon completion of the above, the deponent must
12    affix his signature on the Errata Sheet, and it is to
      then be notarized.
13
           Please forward the signed original of the Errata
14    Sheet to Mr. Christopher Betke, Esquire, for
      attachment to the original transcript, which is in his
15    possession.  Send a copy of same to me.

16         Please return the completed Errata Sheet within
      thirty (30) days of receipt hereof.
17

18
      Lance Hannaford,
19    Court Reporter

20                      _ _ _

21

22

23

24

25
```